**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
Civil Action No.: _19-cv-373_

| | |
|---|---|
| PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS INDIA LTD., | |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| TEC HOLDINGS, INC., F/K/A TRANSTATE EQUIPMENT COMPANY, INC.; TRANSTATE EQUIPMENT COMPANY, INC., F/K/A TRANSTATE HOLDINGS, INC.; ROBERT ANDREW WHEELER, individually, and in his capacity as officer, director, and shareholder of TEC HOLDINGS, INC., F/K/A TRANSTATE EQUIPMENT COMPANY, INC. and officer and shareholder of TRANSTATE EQUIPMENT COMPANY, INC., F/K/A TRANSTATE HOLDINGS, INC., and as Executor of the Estate of DANIEL R. WHEELER; and PEAK TRUST COMPANY— AK, ████████████████ ████, | |
| Defendants. | |

## COMPLAINT

Plaintiffs Philips Medical Systems Nederland B.V., Philips North America LLC, and

Philips India Ltd. (collectively, "Philips" or "Plaintiffs"), by and through their undersigned

counsel, hereby bring the following Complaint against Defendants TEC Holdings, Inc., f/k/a

Transtate Equipment Company, Inc., Transtate Equipment Company, Inc., f/k/a Transtate

Holdings, Inc., Robert Andrew Wheeler, individually, in his capacity as a director, officer, and/or

shareholder of the corporations as set forth herein, and as Executor of the Estate of Daniel R.

Wheeler, and Peak Trust Company – AK, ████████████████████████████████

████████████████████████████████████ (collectively, "Defendants"), and plead as follows:

## NATURE OF THIS ACTION

1.     This case is about Defendants' unlawful attempt to become judgment proof on claims by Philips in a separate action in the Northern District of Georgia (the "Georgia Action").

2.     As set forth in the Georgia Action's operative complaint, Philips alleges that TEC Holdings, Inc., f/k/a Transtate Equipment Company, Inc. ("Transtate I")—at the direction of its owners Daniel Wheeler and Robert Andrew ("Andy") Wheeler (collectively, "the Wheelers")— misappropriated and infringed Philips' intellectual property related to the service of its medical imaging systems and disabled and circumvented Philips' security access controls relating to its service software and other information, all resulting in violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201; violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836; misappropriation of trade secrets and violations of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.*; and copyright infringement, 17 U.S.C. § 101, *et seq.*

3.     The net operating assets of Transtate I (including its name) were sold to new ownership in April 2017 and the business still continues through the present. Philips further alleges in the Georgia Action that this successor entity, Transtate Equipment Company, Inc., f/k/a Transtate Holdings, Inc. ("Transtate II"), has continued Transtate I's unlawful conduct under the direction of Andy Wheeler, its president.

4.     These claims strike at the core of Transtate I and Transtate II's day-to-day business practices since 2012, and Philips currently estimates its potential damages to be tens of millions of dollars.

- 2 -

5.     This case, however, does not focus on Transtate I and Transtate II's unlawful conduct regarding Philips' intellectual property.

6.     Rather, this case addresses other financial and corporate maneuverers by Defendants (**the "Scheme"**) that ultimately siphoned away ███████████████ ███████████████████—assets that otherwise would be subject to a forthcoming judgment for Philips in the Georgia Action.

7.     The trigger for Defendants' Scheme came via a cease-and-desist letter forwarded to Andy Wheeler's inbox in August 2016. That letter, which was sent by counsel for Philips to another company that had hired Transtate I for x-ray servicing, made two points very clear for the Wheelers and Transtate I's business:  First, the letter revealed that Philips had discovered the basic elements of Transtate I's unlawful access and use of Philips' intellectual property (even though Philips did not know at the time that Transtate I was the perpetrator).  Second, the letter made certain that these acts were unlawful, and that Philips was prepared to initiate legal action against anyone responsible.

8.     Having been notified that Philips soon would discover Transtate I was the responsible party, the Scheme began.

   a.  First, the Wheelers altered the articles of incorporation for Transtate I to ████ ██████████████████████████████, while still retaining 100% of the voting control for Transtate I's corporate acts.  ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████.

b.  Second, ███████████████████████████████ by selling the net

operating assets of Transtate I to new ownership (a subsidiary of private equity

firm Jordan Health Products, Inc.). The asset sale carried a total value of █████

████████████████████████████████████████.

c.  Third, the Scheme culminated with the distribution of ████████████████

███████████████████████████████████████████

███████████.

9.     Thus, the Scheme effected a near-complete transfer of assets away from

individuals and entities responsible for the unlawful access and use of Philips' intellectual

property.  Prior to implementing the Scheme, the Wheelers owned 100% of the assets of

Transtate I.  But less than seven months after realizing Philips soon would discover their

unlawful conduct, ████████████████████████████████████████

████████████████████████████████████████

███████.

10.     The Scheme was executed by the Wheelers and Transtate I with the effect and

intent of defrauding Philips by ensuring those parties liable for the unlawful access and use of

Philips' intellectual property would not be able to satisfy a judgment for such conduct.

11.     As further evidence of the intent to defraud Philips, certain Defendants engaged in

a contemporaneous course of communications (or lack thereof) designed to delay, distract, and

deter Philips from filing suit until Defendants had completed each element of the Scheme.  These

acts include, but are not limited to, the following:

- 4 -

a. In late September 2016, after learning that Transtate I was responsible for the unlawful conduct first described in the August 2016 letter, Philips also sent a cease and desist letter to Transtate I. Transtate I did not respond.

b. Two months later (November 2016), Philips sent a second letter to Transtate I. Again, Transtate I did not respond.

c. In early December 2016, Philips sent a third letter to Transtate I. Transtate I, via its President Daniel Wheeler, finally responded one week later.

d. In that response, Daniel Wheeler welcomed the opportunity "to respond substantively" to Philips' allegations. Moreover, Daniel Wheeler assured Philips that it would "agree that there is no basis for further concern" after Transtate I provided additional information and discussed the issues with Philips.

e. Contrary to these representation, this letter was the first and last communication from Daniel Wheeler. Nearly one month later, Transtate I's litigation counsel sent a letter that contained only legal arguments and omitted any additional information about Transtate I's conduct.

12. In the four months that transpired between Philips' September 2016 letter and Transtate I's response in January 2017, Defendants' Scheme was well underway and close to completion. Even in the course of discovery in the Georgia Action, Defendants repeatedly refused to provide discovery on matters related to the Scheme, such as the asset sale between Transtate I and Jordan Health Products, Inc.

13. Indeed, it was only through third-party discovery served on Jordan Health Products, Inc. that Philips was able to uncover evidence of the Scheme and Defendants' efforts to strip assets away from the parties to the Georgia Action. Defendants' use of the Scheme to

- 5 -

shield assets from a judgment in the Georgia Action constitutes a fraudulent, voidable transaction under North Carolina law, and Defendants are liable to Philips on the allegations and claims stated herein.

**PARTIES**

14.　Plaintiff Philips Medical Systems Nederland B.V. is a Netherlands corporation with offices at Veenplius 4-6, 5684 PC Best.

15.　Plaintiff Philips North America LLC is a Delaware LLC, formerly known and doing business as Philips Electronics North America Corporation (a Delaware Corporation), with a principal place of business in Andover, Massachusetts.

16.　Plaintiff Philips India Ltd. is a foreign corporation with a principal place of business in Bangalore, India.

17.　TEC Holdings, Inc. ("Transtate I") is a North Carolina corporation with its principal place of business in Concord, North Carolina and was formerly known as Transtate Equipment Company, Inc.  In or about March or April, 2017, Transtate Equipment Company, Inc. changed its name to TEC Holdings, Inc.

18.　Transtate Equipment Company, Inc. ("Transtate II") is a Delaware corporation with its principal place of business in Deerfield, Illinois, and was formerly known as Transtate Holdings, Inc.  On or about April 27, 2017, Transtate Holdings, Inc. changed its name to Transtate Equipment Company, Inc.

19.　Defendant Robert Andrew Wheeler ("Andy Wheeler") is an individual who, upon information and belief, resides in Concord, Cabarrus County, North Carolina.  Andy Wheeler is the Vice President, Secretary, and a shareholder of Transtate I.  Andy Wheeler previously served as Vice President of Transtate II and is now President of Transtate II.  He also is a shareholder of

- 6 -

Transate II. Andy Wheeler was appointed Executor of the Estate of Daniel R. Wheeler by the Wake County Clerk of Superior Court in File No. 19-E-302 on May 3, 2019. Daniel Wheeler, Andy Wheeler's father, was an individual residing in Wake County, North Carolina. He died on or about March 23, 2019. Prior to his death, Daniel Wheeler was the President and controlling shareholder of Transtate I. This action is brought against Andy Wheeler individually and in his capacity as: i) an officer, director, and shareholder of Transtate I; ii) an officer and shareholder of Transtate II; and iii) Executor of Daniel Wheeler's estate.

      20.    Defendant Peak Trust Company – AK, ███████████████████ ██████████████████████████████████████████ ████████, is an Alaska corporation with its principal place of business in Anchorage, Alaska.

## JURISDICTION AND VENUE

      21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, because Plaintiffs and Defendants are citizens of different states, and the value of the matter in controversy exceeds $75,000.00, exclusive of interest and costs. Injunctive relief is sought pursuant to Rule 65 of the Federal Rules of Civil Procedure.

      22.    This Court has personal jurisdiction over all of the parties pursuant to N.C. Gen. Stat. § 1-75.4(1)(d) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

      23.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1), because Defendant Andy Wheeler resides in this judicial district and because a substantial part of Defendants' acts and omissions giving rise to Plaintiffs' claims against them arose in this judicial district.

## FACTUAL ALLEGATIONS

### Overview and Pending Georgia Action

24.     Philips develops, sells, supports, maintains, and services medical imaging systems, such as x-ray systems, used at hospitals and medical centers, including the proprietary hardware and software used to operate, service, and repair such systems.

25.     Philips' medical imaging systems include Philips' copyrighted and proprietary intellectual property, and proprietary trade secrets, in the form of, among other things, proprietary software that Philips technicians use to service the medical imaging systems. Philips includes proprietary access controls on the medical imaging systems to restrict access to its proprietary software to authorized individuals.

26.     Transtate I provided and Transtate II provides maintenance and support services for certain of such medical systems. Several prior employees of Philips North America LLC were previously employed by Transtate I and are currently employed by Transtate II as service specialists, service technicians, or similar positions.

27.     Transtate I has circumvented, and Transtate II continues to circumvent, the access controls on Philips' medical imaging systems to gain unauthorized access to proprietary and copyrighted software and commit other violations of Philips' intellectual property rights.

28.     On July 28, 2017, Philips filed suit against Transtate I in the Northern District of Georgia, seeking damages as a result of the conduct described above. Philips amended its lawsuit on October 20, 2017 to add Transtate II as a defendant.

29.     Through discovery in the Georgia Action, Philips later learned that the Wheelers personally directed, participated in, and profited from the unlawful conduct underlying Philips' claims. Andy Wheeler developed the exploit software used by Transtate I and Transtate II based

- 8 -

on trade secret information misappropriated from Philips. Daniel Wheeler instructed employees to conceal the steps they used to access tools on Philips' systems.

30.     Accordingly, Philips sought leave to further amend its complaint in the Georgia Action on February 14, 2019 to add Daniel Wheeler and Andy Wheeler as defendants and assert additional causes of action based on facts learned through discovery.

31.     The court in the Georgia Action granted Philips' motion to amend on May 20, 2019. The case is captioned *Philips Medical Systems Nederland B.V.; Philips North America LLC; and Phillips India Ltd. v. TEC Holdings, Inc., f/k/a Transtate Equipment Company, Inc., and Transtate Equipment Company, Inc., f/k/a Transtate Holdings, Inc., and Robert A. ("Andy") Wheeler, individually and in his capacity as executor and personal representative of the Estate of Daniel Wheeler*, Case No. 17-CV-02864 (N.D. Ga.).

32.     During the course of discovery in the Georgia Action, Philips discovered that Defendants named in this case engaged in fraudulent, voidable transfers of assets after Transtate I and the Wheelers learned of Philips' potential claims.

33.     Certain facts that support this Complaint were learned during the course of discovery in the Georgia Action from documents designated as Protected Information pursuant to a Protective Order entered by that court.

34.     On April 8, 2019, Philips moved for relief from the Protective Order to use information from six specific documents designated as Protected Information to plead facts in support of this Complaint.

35.     Defendants opposed Philips' motion, which delayed the filing of this Complaint until a ruling issued from the District Court in the Georgia Action.

36.     On May 20, 2019, the District Court in the Georgia Action granted Plaintiffs'
motion, subject to the condition that Philips continue to protect the information subject to the
Protective Order.  Thus, Philips is filing this Complaint under seal.  A true and accurate copy of
the Order in the Georgia Action is attached as **Exhibit 1.**  A true and accurate copy of the
underlying Protective Order in the Georgia Action is attached as **Exhibit 2**.

37.     The Georgia Action remains pending, and Philips has continued to seek discovery
in that action in support of its claims against the Wheelers, Transtate I, and Transtate II.

38.     However, these defendants have repeatedly delayed Philips' efforts to obtain a
timely resolution and judgment in the Georgia Action.  Defendants in the Georgia Action have
delayed, canceled, or sought to avoid key depositions (including the deposition of Andy
Wheeler), have sought extensions for nearly every motion and discovery response, have refused
to produce promised discovery, and have taken other efforts to draw out the Georgia Action for
as long as possible.

39.     As described herein, this pattern and practice of delay is further evidence of
Defendants' Scheme to become judgment proof in the Georgia Action.

### Philips Sends Cease and Desist Letter Regarding Transtate I's Misappropriation and Use of Philips' Trade Secrets

40.     On or about August 12, 2016, Philips sent a cease and desist letter (the "August
12 Letter") to North American Imaging, a servicing company that contracted for x-ray servicing
of Philips equipment.  The August 12 Letter described how the representatives purportedly
working on behalf of North American Imaging had exploited Philips' x-ray systems in violation
of the Defense of Trade Secrets Act of 2016, the Digital Millennium Copyright Act, and the
Copyright Act of 1976.

- 10 -

41.     Those representatives of North American Imaging who had wrongfully exploited Philips' x-ray system actually were employees of Transtate I, which subcontracted for North American Imaging.  At that time, Philips did not know that Transtate I was the subcontracted company.

42.     On or about August 12, 2016, a vice president of North American Imaging forwarded a copy of Philips' August 12 letter via email to Defendant Andy Wheeler, which he received.

43.     Less than 15 minutes after receiving a copy of the August 12 Letter via email, Andy Wheeler forwarded the August 12 Letter in an email to his father, Daniel Wheeler.

44.     At the time they received the August 12 Letter, Daniel Wheeler was the president of Transtate I and ███████████████ and Andy Wheeler was the vice president of operations of Transtate I and ███████████████.

45.     Transtate I was aware of Philips' claim against Transtate I, as that term is defined under N.C. Gen. Stat. § 39-23.1, no later than August 12, 2016.  Philips is a present and future creditor of Defendants.


### Defendants' Scheme To Become Judgment Proof
### on Philips' Claims in the Georgia Action

46.     After Transtate I and the Wheelers learned of Philips' claims, they began to implement the Scheme—a series of corporate acts, estate planning maneuvers, and multi-million dollar financial transfers—intentionally designed to hide the assets of Transtate I and the Wheelers from the reach of Philips, as creditor and future judgment holder in the Georgia Action, and ███████████████.  Upon its completion mere months after learning of Philips' claims, the Scheme will allow the Wheelers to claim they lack the personal assets to

- 11 -

satisfy a future judgment while continuing to reap the benefits, directly or indirectly, of ███████
████████████████████████████████████.

47. But for the Scheme and Defendants' fraudulent, voidable transfers, these assets, ███████████████████████████████, would be available to satisfy a judgment in the Georgia Action.

**The Scheme, Step 1: Recapitalization of Transtate I's Stock and ███████████**
████████████████

48. The first step of the Scheme began on or about September 28, 2016, which was approximately seven weeks after both Daniel and Andy Wheeler received notice of Philips' claim.

49. In particular, on or about September 28, 2016, Daniel and Andy Wheeler, as President and Secretary, respectively, of Transtate I, amended Transtate I's articles of incorporation to ██████████████████████████████████.

50. Prior to the amendment, Transtate I had 450 shares of stock. The 450 shares ████
█████████████████████████████████████.

51. The amendment to the articles of incorporation created an additional 44,550 shares of Transtate I stock, increasing the number of shares from 450 to 45,000.

52. Of the 45,000 shares, only 450 shares remained voting stock. The additional 44,550 shares were designated non-voting stock. Daniel and Andy Wheeler ████████████
█████████████████████████████████████.

53. After the amendment to the articles of incorporation, the 44,550 new shares of non-voting stock made up 99% of the equity interests of Transtate I.

- 12 -

54. 

55.

56.

57.     Peak Trust Company advertises and touts on its public website the favorable nature of Alaska trust law for purposes of protecting trust property from creditors, which they call the "Alaska advantage." (https://www.peaktrust.com/the-alaska-advantage/) (visited June 7, 2019).

58.     Peak Trust Company lists "Creditor Protection" as "Advantage 2" of the Alaska advantage on its public website. The website explains that based on Alaska's self-settled trust laws, "there is no reason to go 'offshore' (that is, to create a self-settled trust in a jurisdiction

- 13 -

outside the United States)." (https://www.peaktrust.com/the-alaska-advantage/) (visited June 7, 2019).

59.     Peak Trust Company advertises and touts on its public website that its representatives or affiliates were instrumental in re-writing the statutory code governing trusts in Alaska and their role in the Alaska legislature's enactment of the code to make Alaska "a premier jurisdiction for trust services." (https://www.peaktrust.com/genesis-of-peak-trust-company/) (visited June 7, 2019).

60.     Peak Trust Company, on its public website, promotes the use of Alaskan trusts on the grounds that "[u]nlike the laws of other states, Alaska has no special 'class' of creditors" and explains a number of other attributes of the Alaska laws that function to prevent or impede creditors from attaching trust assets, attaching trust distributions, or obtaining court orders to compel distributions. (https://www.peaktrust.com/the-alaska-advantage/) (visited June 7, 2019).

61.     Under the heading "Which Jurisdiction Is Right for You," Peak Trust Company on its website lists in detail specific provisions of Alaska law designed to protect trust assets against creditors. For example, Peak Trust Company explains that, under Alaska law, a creditor must prove intent to defraud that particular creditor, and an "express intent to protect the trust from a beneficiary's future potential creditors is not evidence of an intent to defraud." (www.peaktrust.com/which_jurisdiction/) (visited June 7, 2019).

62.     But even Peak Trust Company does acknowledge, as it must, that a "creditor is still allowed to seek relief for a fraudulent transfer." (www.peaktrust.com/which_jurisdiction/) (visited June 7, 2019).

63.     Peak Trust Company's executives and officers have also publically admitted that fraudulent, voidable transfers—like those alleged here by Transtate I and the Wheelers—are not

- 14 -

protected by Alaska laws.  A March 19, 2018 article co-authored by Jonathan G. Blattmachr

(Peak Trust Company's Director of Estate Planning) and Matthew D. Blattmachr (Peak Trust

Company's Vice President and Senior Trust Officer) states:

> All states basically void, or make voidable, fraudulent transfers (although actions to do so may be dismissed if not timely made under state or US Bankruptcy Code statutes of limitations) . . . . And, of course, a fraudulent transfer can be set aside regardless of the entity or person to whom the property is transferred. In other words, a transfer to a spouse or other relative, or even a friend, which is fraudulent will be set aside if the action is commenced before the running of the statute of limitations.

(*See* "Toni 1 Trust v. Wacker – Reports of the Death of DAPTS for Non-DAPT Residents Is Exaggerated", available at https://shenkmanlaw.com/blog/2018/03/22/toni-1-trust-v-wacker-reports-of-the-death-of-dapts-for-non-dapt-residents-is-exaggerated/)

64.  Upon information and belief, █████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████.

65.  Upon information and belief, █████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████.

66.  Upon information and belief, █████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████.

67. ██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.

68. ███████████████████████████████████████
██████████████████████████████████████
███████.

69. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████.

70. ██████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.

71. Upon information and belief, ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.

72. Upon information and belief, Daniel and Andy Wheeler were ███████
█████████████, the exclusive holders of Transtate I's voting securities, and the only officers of
Transtate I, and ████████████████████████████████████
████████.

73. Daniel Wheeler and Andy Wheeler knew of Philips' potential claims against
Transtate I before they ███████████████.

74.     Upon information and belief, Daniel and Andy Wheeler, as officers and shareholders of Transtate I, ███████████████████████████████████████████ ██████ because of the debt owed to Philips upon its claims in the Georgia Action.

75.     Upon information and belief, Daniel and Andy Wheeler, as officers and shareholders of Transtate I, █████████████████████████████████████████with the intent to hinder, delay, or defraud Philips.

76.     ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████.

### The Scheme, Step 2:  The Wheelers Liquidate
### Transtate I's Stock via the Sale of Assets to Transtate II

77.     Step 2 of the Scheme involved the sale of Transtate I's assets to Transtate II, which would continue the operations of Transtate I essentially uninterrupted.  This step was necessary because ██████████████████████████████████████████ ██████████████████████████████—which would be subject to execution of a judgment in the Georgia Action.  Step 2 would provide the much-needed liquidity to complete the Scheme's goal of stripping away the value of assets subject to a judgment by Philips.

78.     ████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████ This sale included the legal name of Transtate I, and the successor company, Transtate II, would essentially continue the operations of Transtate I without interruption.

- 17 -

79.     Transate I and the Wheelers only pursued and engaged in this transaction with Jordan Health Products, Inc. after receiving notice of Philips' claims per the August 12 Letter.

80.     The sale of Transate I's assets to Transate II closed on March 31, 2017. As consideration for the sale, ███████████████████████████████████████ ██████████.

81.     Transate II acquired substantially all of the assets of Transate I, ███████████ ████████████████████████████████████████████████████████████████.

82.     Andy Wheeler is an owner of Transate II and is now the President of Transate II.

83.     Daniel Wheeler and Andy Wheeler knew of Philips' potential claims against Transate I before they sold the assets of Transate I and the sale occurred shortly before the lawsuit was filed.

84.     Upon information and belief, Daniel and Andy Wheeler, as the sole officers and voting shareholders of Transate I, sold the assets of Transate I because of the debt owed to Philips upon its claims in the Georgia Action.

85.     Upon information and belief, Daniel and Andy Wheeler, as sole officers and voting shareholders of Transate I, sold the assets of Transate I to Transate II with the intent to hinder, delay, or defraud Philips.

**The Scheme, Step 3:  The Wheelers Deplete Transate I's Assets by** ███████████ ██████████████████

86.     Step 3 of the Scheme completed the most crucial step: ██████████████ ████████████████████████████████████████████████████ received from Transate II's purchase of Transate I's assets.

- 18 -

87.     In particular, ███████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████.

88.     ████████████████████████████████
████████████████████████████.

89.     During this time, Daniel and Andy Wheeler remained the only holders of Transtate I's voting shares, and therefore were the only parties capable of causing Transtate I to ██████████████.

90.     Given their knowledge of the claims asserted by Philips in the cease and desist letters, Transtate I and the Wheelers intended to incur or believed or should have believed that Transtate I would incur debts beyond its ability to pay as they became due.

91.     ████████████████████████████████████████.

92.     Transtate I and the Wheelers knew of Philips' potential claims against Transtate I before they ████████████████████████████████████
██████████████████.

93.     Upon information and belief, Transtate I, and Daniel and Andy Wheeler as officers and shareholders of Transtate I, ██████████████████████████ because of the debt owed to Plaintiffs.

94.     Upon information and belief, Transtate I, and Daniel and Andy Wheeler as officers and shareholders of Transtate I, ███████████████████████████████ with the intent to hinder, delay, or defraud Plaintiffs.

### The Wheelers Had Notice of Philips' Claims at Each Step of the Scheme

95.     Throughout the Scheme, the Wheelers and Transtate I received multiple notices of Philips' claims.

- 19 -

96.     After learning that Transtate I was the subcontractor that exploited the Philips x-ray system as described in the August 12 letter, Philips sent its first cease and desist letter to Transtate I on September 27, 2016.  Transtate I did not respond.

97.     Instead, one day later, the Wheelers amended Transtate I's articles of incorporation to ████████████████████████████████████ (Step 1).

98.     Having received no response, Philips sent a second letter to Transtate I on or about November 21, 2016. Again, Transtate I did not respond.

99.     On or about December 9, 2016, Philips sent a third letter to Transtate I, attaching the prior correspondence.

100.    Finally, on or about December 16, Transtate I responded through Daniel Wheeler as president.

101.    In that response, Daniel Wheeler welcomed the opportunity "to respond substantively" to Philips' allegations.  Moreover, Daniel Wheeler assured Philips that it would "agree that there is no basis for further concern" after Transtate I provided additional information and discussed the issues with Philips.

102.    But in reality, Transtate I and the Wheelers were acting at a feverish pace to sell the net operating assets of Transtate I to create liquidity for Step 2 of the Scheme.

103.    Indeed, the Wheelers ████████████████████████████████ ████████████████████ just one week after writing to Philips.

104.    Moreover, Daniel Wheeler's letter to Philips deferred a substantive responsive until January 13, 2017.  This delay allowed nearly all elements of the Scheme to be in place by the time that Transtate I's litigation counsel responded to Philips and rejected all efforts to

- 20 -

cooperate, did not provide additional information, and declined to acknowledge any wrongdoing by Transtate I.

105. Thus, by the time that the Wheelers completed Step 3 of the Scheme (████████ ████████████████████████████████████████████████ ████████████████), the Wheelers and Transtate I had been sent no less than four (4) letters from Philips and had provided two (2) written responses acknowledging those allegations and evidencing their knowledge of Philips' potential claims for Transtate I's unlawful access and use of Philips' intellectual property.

## FIRST CLAIM FOR RELIEF

### (North Carolina Uniform Voidable Transaction Act, N.C. Gen. Stat. § 39-23.4 – The Scheme) (All Defendants)

106. The allegations of paragraphs 1 through 105 of the Complaint are incorporated by reference as if fully set forth herein.

107. The Scheme, ███████████████████████████████████ ████████████████████████████████████████████, is a voidable transaction under N.C. Gen. Stat. § 39-23.4.

108. Transtate I, through the Wheelers as its officers and majority shareholders, █████ ██████with intent to hinder, delay, or defraud Plaintiffs.

109. The Wheelers ████████████████████████████with intent to hinder, delay, or defraud Plaintiffs.

110. ██████████████████████████████████████ ████████████████████████████.

- 21 -

111. At the time ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the Wheelers and Transtate I intended to incur, or believed that they would incur, or reasonably should have believed that they would incur debts beyond their ability to pay as they became due.

112. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮.

113. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

114. Before ▮▮▮▮▮▮▮▮▮▮▮, Transtate I had been threatened with suit by Philips.

115. Transtate I and the Wheelers were aware of Philips' claim against Transtate I prior to ▮▮▮▮▮▮▮▮▮▮▮▮▮.

116. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮.

117. ▮▮▮▮▮▮▮▮▮▮▮occurred shortly before a substantial debt was incurred.

118. Transtate I, through the Wheelers as its officers and majority shareholders, sold all of Transtate I's assets to Transtate II with intent to hinder, delay, or defraud Plaintiffs.

119. Before the sale of its assets to Transtate II, Transtate I had been threatened with suit by Philips.

120. Transtate I and the Wheelers were aware of Philips' claim against Transtate I prior to the sale of Transtate I's assets to Transtate II.

121. The sale was of substantially all of Transtate I's assets.

122. The sale of assets occurred shortly before a substantial debt was incurred.

- 22 -

123. Transate I ███████████████████████████████████████
████████████████████████████████████ with intent to hinder, delay, or defraud
Plaintiffs.

124. ████████████████████████████████████████████████
███████████████████████████████████.

125. At the time ██████████████████████████████, Transate I
intended to incur, or believed that it would incur, or reasonably should have believed that it
would incur debts beyond its ability to pay as they became due.

126. ███████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████.

127. Before ████████████████, Transate I had been threatened with suit by
Philips.

128. ██████████████████████████████████████.

129. The transfer occurred shortly before a substantial debt was incurred.

130. ███████████████████████████████████████████████.

131. As a direct result of the Scheme, Plaintiffs have suffered irreparable injury and
money damages because ████████████████████████████████████████
████████. Therefore Philips cannot be made whole for the damages it incurred by Transate I's
exploitation of Philips' proprietary information. Plaintiffs do not have an adequate remedy at
law, and if Defendants' conduct is not enjoined, Plaintiffs will continue to suffer irreparable
injury and money damages.

- 23 -

## SECOND CLAIM FOR RELIEF

### (North Carolina Uniform Voidable Transaction Act, N.C. Gen. Stat. § 39-23.5 – the Scheme) (All Defendants)

132.    The allegations of paragraphs 1 through 131 of the Complaint are incorporated by reference as if fully set forth herein.

133.    The Scheme, ███████████████████████████████████████████████████ ████████████████████████████████████████████████, is a voidable transaction under N.C. Gen. Stat. § 39-23.5.

134.    Philips' claim against Transtate I arose before any step in the Scheme, as described above, occurred.

135.    Defendants were aware of Philips' claim against Transtate I prior to the time any step in the Scheme, as described above, occurred.

136.    ████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████.

137.    Transtate I ███████████████████████ as a result of the Scheme.

138.    The Wheelers and ███████████████ had reasonable cause to believe ███ ██████████████████████████ as a result of the Scheme.

139.    ████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████.

140.    As a direct result of the Scheme, Plaintiffs have suffered irreparable injury and money damages because ████████████████████████████████████████ ██████████. Therefore Philips cannot be made whole for the damages it incurred by Transtate I's

- 24 -

exploitation of Philips' proprietary information. Plaintiffs do not have an adequate remedy at law, and if Defendants' conduct is not enjoined, Plaintiffs will continue to suffer irreparable injury and money damages.

### THIRD CLAIM FOR RELIEF

**(Civil Conspiracy) (All Defendants)**

141. The allegations of paragraphs 1 through 140 of the Complaint are incorporated by reference as if fully set forth herein.

142. Defendants agreed to cooperate and act with each other to carry out the Scheme with the intent to hinder, delay, or defraud Plaintiffs.

143. Defendants Daniel Wheeler and Andy Wheeler, individually and in his capacity as executor of Daniel Wheeler's estate, participated in the Scheme by working with Transtate I, Transtate II, and Peak Trust Company ███████████████████████████████ ████ and to sell the assets of Transtate I to Transtate II to avoid having to pay damages to Plaintiffs.

144. Transtate I, through its officers and directors, participated in the Scheme by working with the Wheelers, Transtate II, and Peak Trust Company ███████████████ ████████████████████████, to sell the assets of Transtate I to Transtate II, and to ████ ███████████████████████████████████████████ ████████ to avoid having to pay damages to Plaintiffs.

145. Peak Trust Company participated in the Scheme by working with Transtate I, Transtate II, and the Wheelers to ████████████████████████████████, to sell the assets of Transtate I to Transtate II, and to ████████████████████████████

████████████████████████████████████████ to avoid having to pay damages to Plaintiffs.

146.    In furtherance of the conspiracy, the Defendants fraudulently transferred ███ ████████████████████████████ in violation of North Carolina's Uniform Voidable Transactions Act.

147.    As a direct result of the Scheme, Plaintiffs have suffered irreparable injury and money damages from Defendants' conspiratorial acts because ████████████████████ ████████████████████████. Therefore Philips cannot be made whole for the damages it incurred by Transtate I's exploitation of Philips' proprietary information. Plaintiffs do not have an adequate remedy at law, and if Defendants' conduct is not enjoined, Plaintiffs will continue to suffer irreparable injury and money damages.

### FOURTH CLAIM FOR RELIEF

**(Unfair and Deceptive Acts or Practices under North Carolina General Statutes Section 75-1.1) (Defendants Transtate I, Transtate II, and Andy Wheeler individually and in his capacity as an officer, director and shareholder of Transtate I and Transtate II and in his capacity as Personal Representative and Executor of Daniel Wheeler's estate)**

148.    The allegations of paragraphs 1 through 147 of the Complaint are incorporated by reference as if fully set forth herein.

149.    The conduct and transactions described in this Complaint are in or affecting commerce, as they involve, among other things, the sale and transfer of assets in an effort to avoid business debts resulting from commercial practices.

150.    The misconduct of Transtate I, Transtate II, and the Wheelers, including their efforts as described in this Complaint to complete the Scheme with an intent to defraud Philips, was immoral, unethical, oppressive, and unscrupulous, and constituted unfair or deceptive acts or practices within the meaning of N.C. Gen. Stat. § 75-1.1.

- 26 -

151.    As a proximate and foreseeable result of the misconduct of Transtate I and the Wheelers, Philips has suffered damages in an amount to be proven at trial in excess of $75,000.

152.    As a direct result of the Scheme, Plaintiffs have suffered irreparable injury and money damages because ██████████████████████████████████████████ ████████. Therefore Philips cannot be made whole for the damages it incurred by Transtate I's exploitation of Philips' proprietary information. Plaintiffs do not have an adequate remedy at law, and if Defendants' conduct is not enjoined, Plaintiffs will continue to suffer irreparable injury and money damages.

## FIFTH CLAIM FOR RELIEF

### (Constructive Trust) (All Defendants)

153.    The allegations of paragraphs 1 through 152 of the Complaint are incorporated by reference as if fully set forth herein.

154.    Peak Trust Company, ████████████████████████████████████████ ██████████████████████████████████████████.

155.    Peak Trust Company, ████████████████████████████████████ ██████████████████████████████████████████ ████████.

156.    Philips is a creditor of Defendants Transtate I and Transtate II. Transtate I, Transtate II, and Daniel and Andy Wheeler, as officers, directors, and shareholders, owed a duty to Philips not to fraudulently divert assets away from Transtate I.

157.    Peak Trust Company, ████████████████████ will be unjustly enriched if it is allowed to ████████████████, and Defendants Andy Wheeler, individually and as the Executor of the Estate of Daniel Wheeler, will be unjustly enriched if ████████████████

- 27 -

████████████████████████████████████████████████████████
███████████████.

158. For Peak Trust Company ██████████████ would be inequitable.

159. Peak Trust Company's ██████████████ deprives Philips of the beneficial interest in having assets to collect against in the event a judgment is entered against Defendants in the Georgia Action.

160. Philips is entitled to an order imposing a constructive trust ████████████ ████████ such that Peak Trust Company is deemed the holder of legal title to the assets as a constructive trustee in favor of Philips.

## SIXTH CLAIM FOR RELIEF

### (Punitive Damages) (All Defendants)

161. The allegations of paragraphs 1 through 160 of the Complaint are incorporated by reference as if fully set forth herein.

162. The misconduct of Defendants in carrying out the Scheme as described in this Complaint, ███████████████████████████████████████ ████████████, the sale of Transtate I's assets to Transtate II, and ███████████████ ███████████████████████████████████████, all in the attempt to avoid payment on Philips' claims asserted in the Georgia Action, is fraudulent, malicious, and willful or wanton conduct within the meaning of N.C. Gen. Stat. §§ 1D-5 and 1D-15.

163. As a result of the misconduct of Defendants, Philips is entitled to punitive damages under N.C. Gen. Stat. Chapter 1D.

- 28 -

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Philips Medical Systems Nederland B.V., Philips North America LLC, and Philips India Ltd. respectfully request:

1. That the Court enter a preliminary injunction providing the following relief:

   a. Enjoining all Defendants and their agents, partners, servants, employees, and all persons acting under, in concert with, or on behalf of any of them from, in any manner, selling, transferring, encumbering, conveying, or otherwise disposing of the property received by ███████████ from the sale of Transtate I during the pendency of this action;

   b. Ordering defendant Peak Trust Company to provide a full accounting █████ ████████████████████████████████████████████████ ██████;

   c. Ordering defendant Peak Trust Company to provide full and complete copies ████████████████████████████████;

2. That the Court enter judgment in favor of Plaintiffs on all claims for relief;

3. That Philips have and recover of Defendants, jointly and severally, compensatory damages in an amount in excess of $75,000 to be proven at the trial of this action;

4. That Philips have and recover of Defendants, jointly and severally, punitive damages in an amount to be proven at the trial of this action;

5. That Philips have and recover of Defendants, jointly and severally, treble damages under N.C. Gen. Stat. § 75-16.2 as a result of their unfair and deceptive acts and practices;

- 29 -

6. That the Court void all fraudulent transfers of the Defendants to the extent necessary to satisfy a judgment in favor of Plaintiffs;

7. That the Court enter an order allowing Plaintiffs to levy execution against the assets fraudulently transferred by Defendants;

8. That the Court impose a constructive trust on ███████████████ in favor of Plaintiffs;

9. That the Court enter a permanent injunction ordering the return of all property ███ ███████████████ to Transtate I;

10. That the Court award Philips its reasonable attorneys' fees to the extent permitted by applicable law;

11. That the Court tax the costs of this civil action to Defendants; and

12. That the Court grant Plaintiffs such other and further relief as it deems just and proper.

This the 30th day of July, 2019.

/s/ *Jonathan P. Heyl*
Jonathan P. Heyl
N.C. State Bar No. 25559
jheyl@foxrothschild.com
Jeffrey P. MacHarg
N.C. State Bar No. 37546
Jmacharg@foxrothschild.com

FOX ROTHSCHILD LLP
101 North Tryon Street, Suite 1300
Charlotte, NC 28246
Telephone: (704) 384-2600
Facsimile: (704) 384-2800

Kirsten R. Rydstrom
Pa. ID 76549 (*Pro hac vice application forthcoming*)
Christopher R. Brennan
Pa. ID 313534 (*Pro hac vice application forthcoming*)
REED SMITH LLP
225 Fifth Avenue
Pittsburgh, PA 15222
Tel.:    (412) 288-3131
Fax:    (412) 288-3063
Email: krydstrom@reedsmith.com

*Counsel for Plaintiffs*