# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:19-cv-373-MOC-DCK

| | | |
|---|---|---|
| PHILIPS MEDICAL SYSTEMS, | ) | |
| NEDERLAND B.V., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| TEC HOLDINGS, INC., et al., | ) | **ORDER** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Plaintiff's Motion for Preliminary Injunction, filed by Philips India, Ltd., Philips Medical Systems Nederland B.V., and Philips North America, LLC. (Doc. No. 181). The Court held a hearing on the motion on August 15, 2022. Having considered Plaintiff's motion and reviewed the pleadings, the Court enters the following Order.

## I.    BACKGROUND

### A. The Parties

Philips makes and sells various medical imaging systems–such as its Allura diagnostic X-ray machines–and also services those systems.[1] Philips' medical imaging systems include Philips' copyrighted and proprietary intellectual property, including proprietary software that only Philips technicians and other authorized personnel may use to service the medical imaging systems.[2]

---

[1] See Lead Case Doc. No. 139 at ¶¶ 30–31.
[2] See, e.g., id. at ¶¶ 255–58.

-1-

Defendants include TEC Holdings, Inc. ("TEC"); Robert Andrew Wheeler, individually, in his capacity as Executor of the Estate of Daniel R. Wheeler, and in his capacity as an officer and shareholder of TEC Holdings, Inc. ("Wheeler"); and Peak Trust Company – AK ("Peak"), which is sued in its capacity as the trustee of The RAW Family Trust and The Wheeler Family Trust. Transtate Equipment Company, Inc. is referred to herein as "Transtate."

Defendant Transtate I is a North Carolina corporation formerly known as Transtate Equipment Company, Inc. Around March or April 2017, substantially all of Transtate I's assets were sold to an entity formed by Jordan Health Products, Inc., called Transtate Holdings, Inc. ("Transtate II"). Transtate I provided, and Transtate II continues to provide, services that include maintaining and modifying certain Philips medical systems.

Defendant Robert Andrew Wheeler ("Andy Wheeler") is the President, Secretary, and a shareholder of Transtate I.[3] He also served as Vice President of Transtate I and is now President and shareholder of Transtate II.[4] Daniel ("Dan") Wheeler, Andy's father, was the President and controlling shareholder of Transtate I.[5] At the time of Transtate I's asset sale, Dan Wheeler owned 51% of Transtate I and Andy Wheeler owned 49%.[6] Dan Wheeler passed away in 2019, and Andy Wheeler became Executor of his estate on May 3, 2019.[7]

This action concerns the redemption of certain sale proceeds following a March 2017 asset purchase agreement between TEC and a third party, Transtate, including the Wheelers'

---

[3] Ex. 1 (10/26/21 A. Wheeler Depo.) at 11:4–20.
[4] Id. at 10:14–12:12.
[5] Id. at 33:8–15.
[6] Ex. 2 at JHS-000078-82, JHS-000122.
[7] Ex. 3.

-2-

retirement, estate, and tax planning activities. Philips brings a claim for a violation of the North Carolina Uniform Voidable Transactions Act, N.C. GEN. STAT. § 39-23.1, et seq. ("NCUVTA"). Philips' motion asks the Court to assist in creating a guaranteed fund from Defendants' assets to satisfy its claims in the Lead Case by freezing Defendants' funds and assets.

As with most everything so far in the related Philips cases, the parties characterize the facts in diametrically opposed terms. The parties agree on very little. Therefore, the Court sets forth each parties' statement of relevant facts before delving into the discussion.

## B. PLAINTIFF'S STATEMENT OF RELEVANT FACTS

### i. Philips Sends Its First Cease and Desist Letter Threatening Litigation Over Hacking And IP Theft and Infringement by the Wheelers and Transtate I

On August 10, 2016, Philips sent a cease-and-desist letter (the "August 10 Letter") to North American Imaging ("NAI"), a servicing company that contracted to service Philips X-ray equipment.[8] That letter described how representatives working on behalf of NAI had exploited Philips' X-ray systems in violation of trade secret and copyright law, and also made clear that Philips was prepared to initiate legal action against anyone responsible.[9] Philips did not yet know that the NAI representatives who had exploited Philips' X-ray system were actually employees of Transtate I, which subcontracted for NAI.[10]

On August 12, 2016, NAI forwarded the August 10 Letter by email to Andy Wheeler, who forwarded it to Dan Wheeler.[11] Dan Wheeler then forwarded it to Transtate's IP counsel and

---

[8] Ex. 4 at TRANSTATE-0073390-73392.
[9] Id.
[10] Id.; Ex. 5 (02/19/19 D. Wheeler Depo.) at 220:11–224:5, 284:6–285:22.
[11] Ex. 4.

-3-

discussions ensued between Transtate's and NAI's lawyers.[12] Philips asserts that, by then, Transtate I had earned millions in illegal revenue from servicing Philips medical imaging devices using Andy Wheeler's "FD_Service" software hacking tool, which modifies Philips medical systems to circumvent access controls to use software functionality that Transtate I was not licensed to access.[13]

Soon thereafter, the Wheelers and Transtate I formally retained trust and estates counsel, Beth Wood. Before this time, Andy Wheeler did not have any family trust that he could recall, only a will.[14] There is no evidence that Dan Wheeler had a trust before 2016, either.[15] According to Philips, around this same time, in late August 2016, Dan and Andy Wheeler demonstrated their awareness of the litigation threat from Philips by discussing concerns about Philips discovering counterfeit keys (used to obtain unauthorized access to Philips' servicing software), noting that "[t]he bear is awake!!" in reference to Philips.[16]

Also in this same timeframe, counsel for Transtate I sought to conceal from Philips that Transtate I had been the service provider for NAI. But in early September 2016, NAI's counsel refused that request as inappropriate:

> Regarding your request that that NAI consider entering a joint defense agreement with Transtate in connection with this matter and/or that NAI withhold the identity of Transtate in the installation at Lakewood Regional Medical Center, NAI believes such an agreement would be inappropriate at this time. To the contrary, [redacted] asks that Transtate step forward to address the matter, as the subcontractor referred to in Philips' letter and the only party with knowledge as to

---

[12] Ex. 1 at 30:14–41:6.
[13] Ex. 8 at 64–103; see also Ex. 9 (05/13/21 A. Wheeler Depo.) at 50:7–20; Ex. 10 (12/15/18 M. Froman Depo.) at 69:23–70:1, 74:19-75:11 (FD Service "circumvents Philips' security measures"); see also generally, Lead Case Doc. Nos. 380, 408.
[14] Ex. 1 at 28:25–29:7.
[15] See, e.g., id. at 29:4–30:3.
[16] Ex. 6; Ex. 7 (02/18/19 D. Wheeler Depo.) at 131:2–139:8.

-4-

what did and did not happen, to better address the concerns raised by Philips.[17]

**ii. Defendants Recapitalize Transtate I's Stock and Transfer It to Insiders–The Newly Created Wheeler Trusts**

On September 27, 2016, after NAI disclosed Transtate's identity, Philips sent Transtate I a cease and desist letter threatening litigation.[18] The next day, the Wheelers amended Transtate I's articles of incorporation to dilute Transtate I's stock, increasing its shares from 450 to 45,000, of which 44,550 (or 99% of the equity interests of Transtate I) were made into non-voting stock.[19] The Wheelers alone maintained complete control while recapitalizing to allow them to stash the value of the company into irrevocable trusts.

Over the next few months, the Wheelers transferred all 44,550 shares of their newly issued non-voting stock to three irrevocable trusts established to shelter these assets: (1) the Wheeler Family Trust, which names Dan Wheeler as beneficiary and Andy Wheeler as successor beneficiary; (2) the RAW Family Trust, which names Andy Wheeler as beneficiary; and (3) the Robert A. Wheeler Family Trust, which also names Andy Wheeler as beneficiary (collectively, the "Wheeler Trusts").[20] The first of these trusts, the "Alaskan" Wheeler Family Trust, was established on September 29, 2016, the day after amendment of Transtate I's Articles.[21]

On November 21, 2016, Philips sent a second cease and desist letter to Transtate I, and hearing nothing, sent a third letter on December 9, 2016.[22] Less than a week later, on December

---

[17] Ex. 15 at Philips_TEC0001286.
[18] Ex. 16 at TRANSTATE-0000124–27.
[19] Ex. 17.
[20] Exs. 12–14, 18–20, 24 at TEC-0000025.
[21] Ex. 12.
[22] Ex. 16 at TRANSTATE-0000122–23, TRANSTATE-0000128–29.

-5-

14, 2016, Transtate I's CFO, Ryan Lynch, on behalf of Transtate I and the Wheelers, disclosed Philips' threat of litigation and at least some of Philips' cease and desist letters to Jordan Health, which was negotiating to purchase the assets of Transtate I. Two days later, on December 16, they all participated in a call to discuss Philips' claim with Transtate I's attorneys.

That same day, December 16, Dan Wheeler responded to Philips' letters, stating he took the issues "seriously," purporting to welcome the opportunity "to respond substantively," and assuring Philips it would "agree that there is no basis for further concern" after Transtate I provided information, which he said it would do by January 13, 2017.[23] Three days later, on December 19, 2016, the Wheelers created two additional irrevocable trusts: the "Alaskan" RAW Family Trust and the Robert A. Wheeler Family Trust.[24] Defendant Peak Trust Company—AK ("Peak Trust"), a company that touts Alaska trust law for protecting trust property from creditors, was installed as the general and administrative trustee for the two "Alaska" trusts.

Between December 31, 2016, and February 2017, the Wheelers transferred all 44,550 shares of their newly issued non-voting stock in Transtate I (99% of its total shares) to the Wheeler Trusts.[25] In exchange, Dan and Andy Wheeler received promissory notes from the "Alaska" trusts for $7,462,164.00 and $4,059,000.00, respectively.[26] However, no consideration was paid for the shares gifted to the third trust: the Robert A. Wheeler Family Trust.[27]

---

[23] Ex. 22.
[24] Exs. 13–14.
[25] Exs. 18–20, 24 at TEC-0000025.
[26] Exs. 27–28. To calculate the value of the promissory notes, the Wheelers used an appraisal of Transtate I's new Class B non-voting stock. (Ex. 25). Philips asserts that the appraisal valued shares at far below their reasonable market value, as evidenced by an IRS audit and settlement that substantially adjusted upwards the value of the Class B stock. (Ex. 26).
[27] Exs. 20, 29.

-6-

As the above transfers were being executed, on January 13, 2017, Transtate I's IP counsel responded to Philips' cease and desist correspondence. Philips asserts that, contrary to Dan Wheeler's earlier promise to provide substantive information, the letter rejected all efforts to cooperate, did not provide additional information, and declined to acknowledge wrongdoing.[28] According to Philips, during this time Defendants were trying to conceal their infringing methods from Philips. For example, on February 16, 2017, Dan Wheeler sent a memo to all Transtate I employees instructing them to conceal their access methods, which he admitted was "partially motivated by Philips' position."[29] As the Georgia Court originally presiding over the Lead Case observed, this memorandum displayed Defendants' "policy of secrecy" in hiding information from Philips.[30]

### iii. The Wheelers Liquidate Transtate I's Stock and Shift over $16.3 Million to the Wheeler Trusts

On March 30, 2017, Transtate I amended its North Carolina Articles of Incorporation to change its name to TEC Holdings, Inc. The next day, it closed on the sale of its assets to Transtate Holdings, Inc. (a newly formed entity owned by Jordan Health) ("Transtate II") for $26 million.[31] According to Philips, directly undermining Defendants' claim that they had no concerns about liability to Philips, the March 31, 2017, asset purchase and sale agreement ("APA") between Transtate I and Transtate II included Philips' cease and desist letters as an exhibit, allocated potential liability for Philips' claims in an indemnity provision, and gave the

---

[28] Ex. 30.
[29] Ex. 31; Ex. 7 at 111:21–112:21.
[30] Lead Case Doc. 135 at 14.
[31] Exs. 32–33.

Wheelers the "right to control the defense of the Philips matter."[32]

Defendants proceeded with the sale of Transtate I. On March 31, 2017, sales proceeds of about $16.467 million were transferred into Transtate I's bank account. According to Philips, less than a month later, the Wheelers, as the sole officers and voting shareholders of Transtate I, drained Transtate I's bank account of $16.3 million in sales proceeds, which they wired directly to their Wheeler Trusts. Philips asserts that this left Transtate I insolvent.[33] The Wheelers, as trustees, beneficiaries, and insiders, retained control over these monies. On July 28, 2017, Philips filed the Lead Case against Transtate I, seeking damages as a result of the conduct described in the cease and desist letters, later adding Transtate II and Dan and Andy Wheeler as defendants. (Lead Case Doc. 1).

**iv. Philips' Assertion that the Wheelers Hid Assets in The Wheeler Trusts, Additional Trusts, And Elsewhere**

Philips asserts that Wheelers engaged in additional suspect transfer activities, and that the trust assets, which once stood at over $16 million, have been drained down to $4.6 million as of September 30, 2021. According to Philips, Defendants refused to produce critical information and documents revealing the details of, purposes for, and recipients of these transfers. Instead, Andy Wheeler adopted a "take my word for it" approach, claiming that all transfers out of the trusts were legitimate, while at the same time blocking Philips from the documents that would allow tracing to determine the veracity of those claims. This forced Philips to seek Court authorization to file a motion to compel.[34]

---

[32] Ex. 33 at §§ 1.2, 11.1, 11.4; Ex. 2 at JHS-000054–66.
[33] Ex. 35; Ex. 36 (Greg Reagan Decl.) at ¶¶ 11–45.
[34] Ex. 37; see also Exs. 38–40.

According to Philips, additional questionable transfers include:

- Dan Wheeler's 2018 transfer of his residence to an LLC he created called WFT I, LLC (of which he was sole member and owner), which the Wheeler Family Trust thereafter purchased a 100% interest in by paying $885,000 from the Transtate I sales proceeds Philips alleges were fraudulently transferred. The house was sold in 2021, but Defendants have failed to produce any documents or information showing what happened to those sales proceeds.[35]

- Dan Wheeler's assignment in 2018 of the $7,462,164 promissory note at the center of Philips' fraudulent transfer claims to a new fourth trust created mid-litigation, the Daniel R. Wheeler Revocable Trust. (Ex. 42). According to Philips, although a copy of this trust was produced on the last day of fact discovery by a third party (lawyer Beth Wood), neither the Wheelers nor TEC previously produced it and Mr. Wheeler also refused to produce any financial or accounting documents concerning this trust.[36]

- Andy Wheeler's transfer mid-litigation in October 2019 of more than 6,000 shares of Transtate I's non-voting stock, which were part of the 2016-2017 alleged fraudulent transfers of stock into the Wheeler Trusts, to a new fifth trust created the same month–the R. Andrew Wheeler Revocable Trust.[37] (Ex. 43). Key evidence relating to this trust, including evidence of a significant additional Transtate I disbursement into this trust, was disclosed for the first time in documents produced on the last day of discovery and after the discovery close.[38] Yet Mr. Wheeler has failed and refused to produce this trust or any related financial and accounting documents even though the trust is undisputedly relevant.

**v. Philips' Assertion that the Wheelers Drained Their Trusts with More Transfers**

**to Insiders, and Andy Wheeler Refused to Produce Documents Showing where the Money**

---

[35] Ex. 29 at 5, 11. Similarly, the RAW Family Trust holds an asset (the Barbee Chapel LLC), which apparently holds real estate somewhere (a condominium) purchased with more than $500,000 in fraudulently transferred trust assets. (Ex. 41). Philips contends that Mr. Wheeler has also failed and refused to produce any lease/rental agreements concerning the property or provide any financial statements, balance sheets, or income/accounting records for this asset.
[36] See Ex. 39.
[37] Ex. 43.
[38] See Ex. 43 (produced on last day of discovery); Ex. 44 at TEC0004891, item 16(D) (reflecting distribution to this specific trust), TEC0004868, line 7 (reflecting total distributions to trusts) (produced on 11/11/2021 after close of discovery); see also Ex. 39 at 5, 8.

Went

Philips asserts that the Wheelers have drained roughly $13 million dollars out of a total of $16.3 million in Transtate I sales proceeds, plus later deferred sales proceeds of $1.4 million transferred to the Wheeler Trusts' accounts–all after receiving notice of Philips' claims.[39] Philips asserts that the liquid assets in the Wheeler Trust accounts have dwindled to roughly $4.6 million, nowhere near enough to satisfy a judgment in the amount that Philips seeks in the Lead Case.[40]

Philips has presented the following chart reflecting deposits into and remaining balances of these accounts[41]:

| Wheeler Trusts Deposits & 9/30/21 Balance | Wheeler Family Trust | RAW Family Trust | Robert A. Wheeler Family Trust | Totals |
|---|---|---|---|---|
| 4/18/17 Initial deposits wired from Transtate I out of asset sale proceeds | $8,342,400 | $4,537,500 | $3,455,100 | $16,335,000 |
| 7/16/20 Transtate I deferred sales price payment | $611,633 | $454,428 | $346,081 | $1,412,142 |
| **Total Transtate I cash deposits** | **$8,954,033** | **$4,991,928** | **$3,801,181** | **$17,747,142** |
| **9/30/21 remaining balance in accounts** | **$3,248,761.50** | **$1,400,216.08** | **$5,996.65** | **$4,654,974.23** |

Philips asserts that it was not aware of this extensive depletion of trust assets until Mr. Wheeler produced account statements in late October 2021. According to Philips, these statements are from multiple accounts, reflecting a Byzantine series of transfers to, from, and out

[39] Ex. 36 at ¶ 47; id. at Ex. G; Ex. 45.
[40] Ex. 36 at ¶¶ 8–10, 47; id. at Ex. G; see also Ex. 8.
[41] Ex. 36 at ¶ 47; id. at Ex. G.

-10-

of various trust accounts, including to newly established accounts and what appear to be the Wheelers' personal checking accounts.[42] According to Philips, often, the account statements have truncated account numbers and abbreviated or undisclosed transferee account information.[43] Moreover, Mr. Wheeler refused to produce documents allowing tracing of the dissipated Wheeler Trust assets and did not agree to sit for deposition until October 26, 2021, only a few days before the discovery cutoff of October 29.

Philips explains that it moved to seek a freeze order upon receiving discovery revealing the extent of asset dissipation, despite the delays and obstruction by Defendants.[44] As for the transferred trust funds, Andy Wheeler testified that most of the funds in the Wheeler Family Trust and RAW Family Trust went to him and Dan Wheeler, as "promissory note payments" for Transtate I stock. Specifically, for both trusts, he testified that he "would categorize all of the distribution thus far as loan paybacks for the note," and that "outside of investments that are already ongoing, the only other direction is payback of a note."[45]

---

[42] See, e.g., Ex. 36 at Ex. G (detailing disbursements); Exs. 46–55 (trust bank account statements), 59–66 (trust brokerage account statements).

[43] See, e.g., Ex. 36 at p. 28 (truncated account numbers); Ex. 48 at WHEELER_PHILIPS_00001801 (transfer of $300,000 for "Tele-Transfer to Checking xxxxxxxxx0151 Reference# Tfe2Yfbjxg").

[44] Philips asserts that Transtate I produced its documents in this case beginning one week before the close of discovery, and continuing for two weeks after the close of discovery. Likewise, Andy Wheeler failed to produce documents reflecting any current balances in the relevant trust accounts until the week before and the day discovery closed. Defendants also delayed meet and confer discussions and pushed off depositions until days before the close of discovery. (See, e.g., Ex. 56 (pushing off meet and confer because defense counsel was "busy" with proceedings in the related cases and "discovery in this case does not close until later in October."); see also Ex. 57 (Mr. Wheeler's counsel refusing to address document production issues until Philips addressed unidentified issues with Philips' production, even though Mr. Wheeler had not served any document requests to Philips); Ex. 58 (email refusing to produce Mr. Wheeler for deposition when noticed and pushing the deposition to end of discovery)).

[45] Ex. 1 at 76:2–77:18, 113:4–21.

-11-

Philips contends that the "note" payments made by the Wheeler-controlled Wheeler Trusts to the Wheelers themselves are nothing like payments one sees on an arms-length loan with an amortization schedule.[46] Philips contends that the payments are in varying amounts made with varying frequency to various accounts, including what appear to be checking accounts controlled by the Wheelers, with some statements revealing multiple, six-figure withdrawals in a single month.[47]

Philips asserts that, as for the third, non-"Alaskan" trust–the Robert A. Wheeler Family Trust–it too has very little money left. Indeed, Mr. Wheeler testified that the trust had only about $2,000 in cash as of October 26, 2021.[48] Philips contends that roughly $13 million in Transtate sale proceeds have dissipated from the Wheeler Trust accounts, comprising the vast majority of the assets in those accounts. Philips argues that this is not "normal" estate planning or "legitimate tax planning," as Defendants have argued. Philips contends that "there is nothing normal or legitimate about siphoning away from a privately held corporation the vast majority of its assets– here, more than $16 million transferred in a single day–in the face of threatened litigation, and then during the course of that litigation, dissipating nearly all of those funds while concealing their disposition by refusing to produce obviously-relevant documents and information."[49]

## C.    DEFENDANTS' STATEMENT OF RELEVANT FACTS

### i. The Wheelers' Estate and Tax Planning Beginning in 2015

TEC was founded in 1998 by Dan Wheeler as a family-owned business that was built

---

[46] Exs. 27–28.
[47] See Ex. 36 at Ex. G; Exs. 46–55.
[48] Ex. 1 at 143:8–17.
[49] Doc. No. 183 as 12.

from the ground up, specializing in selling parts, systems, and service related to catheter angiography equipment manufactured by companies such as Siemens, GE, and Philips.[50] In 2015, Dan Wheeler was contemplating his retirement and related estate planning as he began working on the sale of TEC.[51] By late 2015, the Wheelers were in discussions with Pantheon Healthcare Group to sell TEC.[52] Believing that a sale was imminent, in July of 2016, they sought counsel from Beth Wood at the Moore & Van Allen law firm regarding their estate and tax planning needs,[53] including to "attempt to minimize [their] tax obligations in case [they] were to sell the company."[54]

### ii. The Creation of the Trusts as Part of the Wheelers' Estate Planning

Ms. Wood discussed various estate and tax planning ideas with the Wheelers, including the use of trusts. The Wheelers and Ms. Wood engaged in ongoing estate planning activities beginning in the summer of 2016 through early 2017.[55] Ultimately, Ms. Wood set up the three trusts for the Wheelers at issue in this motion, including two known as Beneficiary Defective

---

[50] Ex. B, February 19, 2019 Dep. of Daniel Wheeler ("Feb. 19 D. Wheeler Dep.") at 265:17–267:13, 268:10–22, 277:14–278:07; Ex. C, Declaration of Robert Andrew Wheeler (March 7, 2022) ("Wheeler Dec."), at ¶¶ 3–7, 11, 34.

[51] Ex. A, February 18, 2019 Dep. of Daniel Wheeler ("Feb. 18 D. Wheeler Dep.") at 23:15–25:12 (discussing timing of sale and involvement with Jordan Health); Ex. B, Feb. 19 D. Wheeler Dep. at 251:17–252:19 (explaining estate planning discussions took place months before the Philips' demand letter to NAI and that the Wheelers had started estate planning strategies back in 2015); Ex. C, Wheeler Dec., at ¶¶ 8–10. See also Doc. No. 162, Defendants' Memorandum In Opposition To Plaintiffs' Expedited Motion To Lift Stay To Permit Plaintiffs To Seek Preliminary Injunction ("Defs.' PI Opp.") at pp. 3–12 (providing additional relevant background information as part of Defendants' opposition to Philips' motion to lift the stay).

[52] Ex. C, Wheeler Dec., at ¶ 12.

[53] Ex. C, Wheeler Dec., at ¶ 13.

[54] Ex. B, Feb. 19 D. Wheeler Dep. at 248:24:249:05; Ex. C, Wheeler Dec., at ¶¶ 13.

[55] Ex. D, Declaration of Beth Wood (March 7, 2022) ("Wood Dec."), at ¶¶ 4–63.

-13-

Inheritor's Trusts ("BDIT").[56]

Ms. Wood recommended that Defendant Peak Trust, an Alaska-based company, serve as the General and Administrative Trustees for each BDIT trust.[57] Alaska is regularly selected as the state for establishment of trusts in the United States due to its well-developed and comprehensive trust laws, and is akin to selecting Delaware as the state of incorporation of a new company.[58] According to Defendants, the Wheelers had no independent knowledge of Alaska trust law or the relative pros and cons of using an Alaska trustee and would have authorized the Trusts in any jurisdiction Ms. Wood recommended.

### iii. The Recapitalization of TEC, the Fair Market Valuation of TEC's Non-Voting Stock, and Transfer of the Stock to the Trusts

As part of this estate and tax planning, Ms. Wood recommended recapitalizing TEC and making the new Trusts shareholders of the business, which the Wheelers understood to be part of standard and legitimate estate planning practices.[59] The recapitalization created two classes of stock in the company differentiated only by the right to vote and did not diminish the company's

---

[56] Ex. C, Wheeler Dec., at ¶¶ 14–18. These trusts are known as The RAW Family Trust and The Wheeler Family Trust, which are both BDITs, and The Robert A. Wheeler Family Trust, which is a defective grantor trust. Ex. D, Wood Dec., at ¶¶ 27-29, 34. Collectively, The RAW Family Trust, The Wheeler Family Trust, and The Robert A. Wheeler Family Trust are referred to herein as the "Trusts." The two revocable trusts mentioned in Philips' brief, the Daniel R. Wheeler Revocable Trust and the R. Andrew Wheeler Revocable Trust, are immaterial to this Motion. Ex. D, Wood Dec., at ¶ 83.

[57] Id.; see also Doc. No. 164-4, 30(b)(6) Deposition of Peak Trust (Brandon Cintula), October 12, 2021 ("Peak Trust Dep."), at 194:05–15 ("Q: And what has been your experience dealing with Beth Wood? A: Always positive and favorable. I think she is a true professional . . . . Q: Do you find her to be a well-respected estate planning attorney? A: I do.").

[58] Ex. E, Declaration of Carl L. King (March 7, 2022) ("King Dec."), at ¶ 18; Ex. D, Wood Dec., at ¶ 83.

[59] Ex. C, Wheeler Dec., at ¶ 19; Ex. E, King Dec., at ¶ 20; Ex. D, Wood Dec., at ¶¶ 10, 14, 25, 32, 83.

-14-

value.[60] The recapitalization allowed Dan Wheeler to gift to Andy Wheeler non-voting shares, which were appraised for fair market value by an independent accounting firm.[61] Together with the creation of the Trusts, the recapitalization also allowed the Trusts to purchase non-voting Class B shares of TEC from the Wheelers in exchange for adequately guaranteed promissory notes, again based upon a fair market value appraisal of the share price, and allowed the Wheelers to maintain control of the company through their Class A voting shares.[62] Recapitalization is a common and accepted estate and tax planning tool for owners of closely-held S corporations that allows owners to transfer wealth but retain control of a company.[63]

GreerWalker, LLP, an independent accounting firm retained by Ms. Wood, performed the appraisal following the Professional Standards set by the American Institute of Certified Public Accountants, and valued one share of TEC Class B Non-voting stock at $328.[64] In a series of transactions in December 2016 and February 2017, the Class B Non-voting stock in TEC was transferred to the Trusts for reasonably equivalent value, based on the stock's fair market value as determined by GreerWalker.[65] Defendants assert that Philips' expert in the present case, Mr. Reagan, does not appear to contest that these transfers of TEC's stock to the Trusts were for reasonably equivalent value.[66]

---

[60] Ex. D, Wood Dec., at ¶¶ 10, 14, 25, 83; Ex. E, King Dec., at ¶ 20.
[61] Id.
[62] Ex. D, Wood Dec., at ¶¶ 14, 25-26; Ex. E, King Dec., at ¶ 20.
[63] Ex. D, Wood Dec., at ¶¶ 25, 83; Ex. E, King Dec., at ¶ 20.
[64] Ex. D, Wood Dec., at ¶ 43; Ex. E, King Dec., at ¶ 27.
[65] Ex. D, Wood Dec., at ¶¶ 43-58; Ex. E, King Dec., at ¶¶ 25–26. Courts have recognized that, although "reasonable equivalent value" does not necessarily require "fair market value," fair market value satisfies the reasonably equivalent value standard. See, e.g., In re Morris Commc'ns NC, Inc., 914 F.2d 458, 466–67 (4th Cir. 1990); Hollar v. Myers (In re Hollar), 184 B.R. 243, 251–52 (Bankr. M.D.N.C. 1995).
[66] See generally Doc. No. 183-32, Declaration of Gregory T. Reagan, CPA/CFF/ABV, CFE,

-15-

### iv. Philips' Allegations Related to an X-Ray Tube Installation at Lakewood

On August 12, 2016—well after the Wheelers began planning for the sale of TEC and working with Ms. Wood for their related estate planning in July 2016—a TEC customer, North American Imaging ("NAI"), notified Andy Wheeler that Philips had inquired about an x-ray tube installation in June 2015, at the Lakewood Regional Medical Center ("Lakewood") in California.[67] NAI identified TEC to Philips as the subcontractor that performed the tube installation.[68] At that time, the Wheelers believed Philips' concern was with NAI's refurbished x-ray tubes.[69]

On or about December 10, 2016, TEC first received a letter from Philips counsel regarding the 2015 x-ray tube installation at Lakewood.[70] TEC responded to Philips' counsel on December 16, 2016,[71] and informed Jordan Health of Philips' letter as part of due diligence.[72] On

---

CVA in Support of Plaintiffs' Motion For Preliminary Injunction ("Reagan Dec.") The I.R.S.'s audit of Dan Wheeler's 2016 Federal Gift Tax Return only focused on the determination of fair market value for the Class B non-voting shares gifted to Andy's Family Trust and sold to the Wheeler Family Trust. The I.R.S. did not question either the lack of marketability discount or the lack of voting rights discount that GreerWalker applied in the appraisal. After extensive negotiations, in June 2019, Dan Wheeler's Estate received a notice from the I.R.S. indicating that no tax was due relating to the audit, which followed from an April 2019 settlement agreement with the I.R.S. that: (1) adjusted the fair market value of TEC's stock from $328/share to $448/share; (2) adjusted the amount of gift tax exemption used by Dan in the gift of certain Class B shares to the Robert A. Wheeler Family Trust; and (3) determined that the sale of Class B stock to the Wheeler Family Trust was for fair market value (with 6,093.88 Class B shares to be included in Dan's estate). Ex. D, Wood Dec., at ¶¶ 64, 71–79; Ex. E, King Dec., at ¶¶ 25–27.
[67] Ex. C, Wheeler Dec., at ¶ 23.
[68] Doc. No. 155, Ex. 1 to Morgan Declaration.
[69] Ex. C, Wheeler Dec., at ¶ 23.
[70] Ex. C, Wheeler Dec., at ¶ 24; see also Doc. No. 155-3, Ex. 4 to Morgan Dec. Reed Smith LLP apparently tried to send two prior letters to TEC in September and November at an older company location, but they were not received until December (when copies were included with the December 10 letter). Ex. C, Wheeler Dec., at ¶ 24.
[71] Ex. C, Wheeler Dec., at ¶ 25.
[72] Id.

-16-

January 13, 2017, TEC sent Philips a more detailed response to the inquiry concerning the Lakewood repair and its servicing methods for Philips-manufactured systems.[73] TEC disputed Philips' allegations of wrongdoing, but invited Philips to engage in further discussions as needed.[74]

### v. TEC's Asset Sale

After being approached by Jordan Health Industries in October 2016,[75] on or about December 22, 2016, the Wheelers signed a Letter of Intent with Jordan Health to sell most of TEC's assets (rather than a stock sale), including the company's name, to a new entity to be formed by Jordan Health.[76] TEC's asset sale closed on March 31, 2017, and was memorialized in an Asset Purchase Agreement ("APA").[77] At the time of the closing on March 31, 2017, as well as the subsequent distribution of sale proceeds by TEC on April 18, 2017, Defendants did not have ongoing concerns regarding the issues previously raised by Philips in 2016.[78] The only specific incident identified in Philips' letter concerned the installation of a single x-ray tube in 2015, which is an FDA-certified component whose installation is included in Philips' own AIAT manual.[79]

---

[73] Ex. C, Wheeler Dec., at ¶¶ 26–27; see also Doc. No. 164-1, Ex. B, Letter from Swain Wood to Philips' Counsel, January 13, 2017.

[74] Ex. C, Wheeler Dec., at ¶ 27; Doc. No. 164-1, Ex. B, Letter from Swain Wood to Philips' Counsel, at p. 3.

[75] Ex. C, Wheeler Dec., at ¶ 21.

[76] Ex. C, Wheeler Dec., at ¶ 22.

[77] Doc. No. 142-5, APA; see also Ex. E, King Dec., at ¶ 28.

[78] Ex. C, Wheeler Dec., at ¶¶ 29, 31–35; see also Doc. No. 162-4, Deposition of Robert Andrew Wheeler, Individually and as TEC's 30(b)(6) Representative, October 26, 2021 ("Wheeler Dep."), 164:15–16, 165:06–10 ("Again, you know, we were – we didn't hear from Philips for quite some time. These letters like that are – especially ones responded to and resolved and not replied to, we had no concerns." . . . "We were highly surprised by the litigation later.").

[79] Ex. C, Wheeler Dec., at ¶¶ 32–33; see generally 21 C.F.R. § 1020.30; Doc. No. 164-7, Philips

Moreover, TEC had ceased performing any servicing of Philips-manufactured systems in March 2017, and thus could have no potential liability for any activities after that time.[80] Philips made no contact of any kind with TEC or the Wheelers after TEC sent its January 13, 2017 letter, until it filed the Lead Case six months later against TEC alone in late July 2017.[81]

Nevertheless, Jordan Health included Philips' possible claims, as identified in its 2016 letters, as one of several contingencies addressed in the APA.[82] It is standard practice to include every possible contingency claim in purchase agreements, and thus the inclusion of this contingency in no way signified that Defendants thought this was a meritorious claim or one that Philips would pursue further.[83] Ultimately, the parties agreed to set aside an escrowed amount of $3 million for contingencies identified in the APA (not just the Philips matter).[84] Notably, TEC's total revenue from the Lakewood job identified in Philips' letters was less than $10,000.[85]

**vi. The Redemption of Certain Sale Proceeds to the Trusts**

On or about April 18, 2017, TEC—believing Philips' concerns and all other contingencies had been addressed—distributed surplus funds from the asset sale (i.e., those funds not needed for expected current or future obligations) as a partial redemption to its shareholders,

---

AIAT Manual (excerpts) at 3–16.

[80] Ex. C, Wheeler Dec., at ¶ 34; See also Ex. F. March 6, 2022 Declaration of Joe Estabrook ("Estabrook Dec.") at ¶ 13.

[81] Ex. C, Wheeler Dec., at ¶¶ 28, 31–32, 38. The Wheelers were not added as parties until May 23, 2019. Lead Case Doc. No. 139, Second Amended Compl. Philips initially filed its motion for leave to amend to add the Wheelers on February 14, 2019. Lead Case Doc. No. 105, Philips' Motion for Leave to Amend Complaint.

[82] See, e.g., Doc. No. 142-5, APA at p. 7 (defining "Philips Matter"); Doc. No. 183-2, APA Exhibits, Ex. 1.2 at pp. 5–17.

[83] Ex. C, Wheeler Dec., at ¶ 27; Ex. F, Estabrook Dec., at ¶ 17.

[84] See, e.g., Doc. No. 142-5, APA at p. 5 (defining the "Indemnification Escrow Amount").

[85] Ex. C, Wheeler Dec., at ¶ 34.

-18-

including the three Trusts set up by Ms. Wood.[86] The RAW Family Trust received approximately $4,537,500.00; the Wheeler Family Trust received approximately $8,342,400.00; and the Robert A. Wheeler Family Trust received approximately $3,455,100.00.[87] According to Defendants, this partial liquidation was a normal part of corporate operations after such a significant financial event and was neither a sham nor based on an exchange made for less than equivalent value.[88]

At that time, TEC retained funds of approximately $712,000, which it believed was sufficient to pay all its reasonably expected current and future obligations/debts when due.[89] This included any claim by Philips, which TEC considered to be both highly unlikely and relatively small based on Philips' 2016 letters.[90] TEC also expected to receive additional funds over the next two years through the APA's earn-out provisions (totaling $5.2 million) and the eventual distribution of the escrowed funds ($3 million).[91]

## II.    LEGAL STANDARD

Whether to grant injunctive relief is within the sound discretion of the district court. See Hughes Network Sys. v. InterDigital Commc'ns Corp., 17 F.3d 691, 693 (4th Cir. 1994). However, granting a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. The danger of a mistake in this setting is substantial." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 284 (4th Cir. 2002) (citations and internal quotations omitted). Consequently, a preliminary injunction is "an extraordinary remedy

---

[86] Ex. C, Wheeler Dec., at ¶¶ 35-37; Ex. E, King Dec., at ¶¶ 37–38.
[87] Ex. C, Wheeler Dec., at ¶ 36.
[88] Ex. E, King Dec., at ¶ 38.
[89] Ex. F, Estabrook Dec., at ¶¶ 8-10, 16; Ex. C, Wheeler Dec., at ¶ 37. TEC had approximately $1.68 million in working capital at the end of 2017. Ex. F, Estabrook Dec., at ¶ 22.
[90] Ex. C, Wheeler Dec., at ¶¶ 34, 37, 52.
[91] Ex. C, Wheeler Dec., at ¶ 51.

. . . which is to be applied 'only in [the] limited circumstances' which clearly demand it." <u>Direx Israel, Ltd. v. Breakthrough Med. Corp.</u>, 952 F.2d 802, 811 (4th Cir. 1992) (quoting <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 800 (3d Cir. 1989)). The injunction must "be tailored to restrain no more than what is reasonably required to accomplish its ends." <u>Consolidation Coal Co. v. Disabled Miners of S. W. Va.</u>, 442 F.2d 1261, 1267 (4th Cir. 1971).

A plaintiff seeking a preliminary injunction must show the following: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. <u>Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.</u>, 722 F.3d 591, 595 (4th Cir. 2013) (citing <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008)). While a balancing test was previously used, today every preliminary injunction factor must be "satisfied as articulated" and courts "must separately consider each <u>Winter</u> factor." <u>Pashby v. Delia</u>, 709 F.3d 307, 320 (4th Cir. 2013) (citing <u>The Real Truth About Obama, Inc. v. FEC</u>, 575 F.3d 342, 347 (4th Cir. 2009)).

III.   **DISCUSSION**

A. **Likelihood of Succeeding on the Merits**

Philips' Amended Complaint includes claims for violations the NCUVTA and for a constructive trust over the Wheeler Trusts' assets.[92] Specifically, the Amended Complaint allege claims for voidable conveyances under Sections 39-23.4 and 23.5 of the NCUVTA.[93]

To obtain relief under Section 39-23.4(a)(1) of the NCUVTA, a plaintiff must prove that

---

[92] Doc. No. 47 at ¶¶ 139–73, 186–94.
[93] Doc. No. 47 at ¶¶ 139–73.

(1) it is now or was a creditor of the debtor at the time of the transfer; (2) the debtor made a transfer under the NCUVTA; and (3) the debtor made the transfer with actual intent to hinder, defraud, or delay its creditors. <u>Hoch v. Hoch (In re Hoch)</u>, Bankr. LEXIS 181, at *17 (Bankr. E.D.N.C. Jan. 25, 2018) (citing N.C. G<small>EN</small>. S<small>TAT</small>. § 39-23.4(a)(1). Philips contends that it meets all elements. First, Philips asserts that it is a creditor under the NCUVTA. "A creditor is broadly defined as 'a person that has a claim,' N.C. G<small>EN</small>. S<small>TAT</small>. § 39-23.1(4), and a claim encompasses 'a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.' N.C. Gen. Stat. § 39-23.1(3)." <u>In re Hoch</u>, 2018 Bankr. LEXIS 181 at *17. "A debtor is 'a person that is liable on a claim.' N.C. G<small>EN</small>. S<small>TAT</small>. § 39-23.1(6)." <u>Id.</u> at *18.

Philips contend that it is a creditor of Transtate I and the Wheelers because it held a claim against them at all relevant times, including at the time of the $16 million transfer. N.C. G<small>EN</small>. S<small>TAT</small>. § 39-23.4(a) ("A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred…."). Philips contends that it is immaterial that Philips filed the Lead Case after the transfers because "[t]he wrong causing an injury that creates an enforceable obligation generates a right to payment" under the NCUVTA. <u>Estate of Chambers v. Vision Two Hospitality Mgmt., LLC</u>, 2013 NCBC 52, at *28–29.

Philips further asserts that the $16 million transfer is a transfer under the NCUVTA. A transfer is "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset …." <u>In re Hoch</u>, 2018 Bankr. LEXIS 181 at *18 (citing N.C. G<small>EN</small>. S<small>TAT</small>. § 39-23.1(12)). "[A]n asset is defined as "[p]roperty

-21-

of a debtor," N.C. GEN. STAT. § 39-23.1(2)," with certain inapplicable enumerated exclusions. Id. "Property is defined in the broadest possible sense as '[a]nything that may be the subject of ownership.'" Id. (citing N.C. GEN. STAT. § 39-23.1(10)). Thus, asset transfers to trusts are transfers under the NCUVTA. See, e.g., id. at *17–20.

Third, Philips contend that the transfer was made with the actual intent to defraud. "Because a debtor is not likely to testify that he had the requisite intent to defraud creditors, the intent to hinder, delay, or defraud can be inferred from extrinsic evidence and the presence of badges of fraud." In re Hoch, 2018 WL 583110, at *19 (quoting In re Clarkson, 387 B.R. 882, 887 (Bankr. S.D. Fla. 2008)). The NCUVTA "provides a non-exhaustive list of badges of fraud to be considered in determining intent under subdivision (a)(1)." Id. These badges of fraud include the following:

> (1)The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; (11) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor; (12) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and (13) The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. GEN. STAT. ANN. § 39-23.4(b).

Philips argues that there is ample evidence of multiple "badges of fraud." First, Philips

argues that the transfer or obligation was to an insider (Badge One). See N.C. GEN. STAT. §
23.4(b)(1). The $16 million transfer from Transtate to the Wheeler Trusts was a transfer to
insiders. The Wheeler Trusts are insiders to Transtate I and the Wheelers because the Wheelers
wholly owned and controlled Transtate I at the time they directed its transfers to the Wheeler
Trusts, in which they are named beneficiaries. See N.C. GEN. STAT. § 39-23.1(7)(b) (if debtor is
a corporation, insiders include directors, officers, persons in control of the corporation, and
relatives of them); Uniform Law Comment to N.C. GEN. STAT. § 39-23.1 ("a trust may be found
to be an 'insider' of a beneficiary"); cf. Kremen v. Cohen, 2011 U.S. Dist. LEXIS 141273, at
*13–14 (N.D. Cal. Dec. 7, 2011) (transfer was to an insider under CUVTA where it was to a
company wholly owned by a company in which the party had an ownership interest and
management position).

    Next, Philips argues that the debtor retained possession or control of the property
transferred (Badge 2). See N.C. GEN. STAT. § 23.4(b)(2). Here, the Wheelers owned and
controlled Transtate I and directed the $16 million transfer to the Wheeler Trusts. Meanwhile, as
trustees, note holders, and beneficiaries of those trusts, the Wheelers retained possession or
control of the monies transferred to the Wheeler Trusts, including, for example, by causing funds
to be disbursed to themselves at will, in varying amounts and at varying intervals. (Ex. 36 at Ex.
G; Exs. 46–55; SRB Inv. Servs., LLP v. Branch Banking & Trust Co., 709 S.E.2d 267, 270 (Ga.
2011) (finding transfers to be fraudulent where individual defendants "remained in possession or
control of the transferred assets after those transfers" by virtue of owning and controlling
companies that received the transferred assets); cf. Limbright v. Hofmeister, 2012 U.S. Dist.
LEXIS 39213, at *10 (E.D. Ky. Mar. 22, 2012) (finding transfers to trusts to be fraudulent where

-23-

"[t]he Hofmeisters claimed to be transferring assets to irrevocable trusts for the benefit of their children, but they continued to control and use these assets to finance their lavish lifestyle."). Philips contends that dispersing roughly $13 million from the trusts within a few years–mainly for alleged "note" payments to themselves–amplifies the conclusion that the Wheelers, as insiders, officers, note payees, and beneficiaries retained their control of these assets.

Next, Philips argues that the transfer or obligation was concealed (Badge 3). See N.C. GEN. STAT. § 23.4(b)(3). Philips contends that neither the Wheelers nor Transtate I disclosed these transfers to Philips. In fact, Transtate I's IP counsel asked NAI – to whom Philips sent its first cease and desist letter – to conceal Transtate I's identity altogether.[94] Then, during litigation in the Lead Case, Philips discovered the transfers from documents produced by a third party after Defendants failed and refused to produce documents concerning the asset sale.[95] Cf. In re Bastrom, 106 B.R. 223, 226 (Bankr. D. Mont. 1989) (debtor's delay in disclosing transfer of assets supported an inference of fraudulent intent). And, in this case, Andy Wheeler has refused to produce statements that would permit a complete tracing of the $16 million in transferred funds. Courts have found similar behavior to evidence concealment and fraudulent intent. See SRB Inv. Servs., 709 S.E.2d at 270 ("At least seven statutory badges of fraud [under Georgia UGTA] are implicated here … the transfers were executed covertly and the Beens and their affiliates refused to provide details when BB&T asked about them and then resisted formal discovery"). Philips notes that the Georgia Court, before transfer to this Court, noted Defendants' "policy of secrecy" preventing "Plaintiffs from gathering all the necessary facts" in the Lead

---

[94] Ex. 15.
[95] Doc. No. 47 at ¶¶ 12–13.

-24-

Case.[96]

Next, Philips argues that the transfer was made after the debtor was threatened with suit (Badge 4). See N.C. GEN. STAT. § 23.4(b)(4). Philips asserts that it sent cease and desist letters threatening suit before the $16 million transfer.

Next, Philips argues that the transfer was of substantially all the debtor's assets (Badge 5). See N.C. GEN. STAT. § 23.4(b)(5). Philips contends that the evidence establishes this badge, too, because the $16 million transfer represents substantially all the non-contingent, liquid value of the sales price for Transtate I's assets.[97] Further, after the $16 million transfer, Transtate I's ability to fund ongoing operations and satisfy its liabilities, using readily accessible liquid assets, was only $712,553.[98] According to Philips, this means roughly 97.4%, or substantially all of Transtate I's total assets to sustain ongoing operations, were sold and then transferred to the Wheeler Trusts and otherwise not readily available, while Transtate I retained the liability of indemnifying Transtate II specifically with respect to Philips' claims.[99]

Philips contends that, the Wheeler Trusts, in turn, disbursed the vast majority of these monies to the Wheelers as purported "note" payments crafted to funnel the sales proceeds to themselves.[100] Accord See, e.g., Eli's, Inc. v. Lemen, 591 N.W.2d 543, 556 (Neb. 1999) (finding fraudulent transfer under UFTA where as part of a sale/leaseback agreement, company "retained virtually no assets and incurred a substantial new obligation," with the cash proceeds flowing to

---

[96] Lead Case, Doc. No. 135 at 13–14.
[97] Ex. 33 at TRANSTATE-0050418-50419 (describing assets sold); Ex. 36 at ¶¶ 21–24.
[98] Ex. 36 at ¶ 24.
[99] Id.; Ex. 33 at §§ 1.2, 11.1, 11.4; see also Ex. 2 at JHS-000054-66 (Philips' cease and desist letters).
[100] Ex. 1 at 76:2-77:18, 113:4–21.

-25-

the company principal).

Next, Philips argues that Defendants removed or concealed assets (Badge 7). See N.C. GEN. STAT. § 23.4(b)(7). Philips contends that Transtate I relinquished the majority of its assets to irrevocable trusts, which in turn, benefitted those who orchestrated the transfers: the Wheelers. Thereafter, nearly $13 million in trust assets were disbursed from those trusts. Philips further asserts that Andy Wheeler has concealed and refused to identify the transferees and provide the statements for the transferee accounts.[101] Philips contends that this evidence strongly supports a finding of fraudulent intent. See Otero v. Vito, 2009 U.S. Dist. LEXIS 86638, at *32–33 (M.D. Ga. Sept. 22, 2009) (granting summary judgment to creditor under Georgia's UFTA where debtor's assets were concealed by "the complexity" of the debtor's scheme, which included "a complex web of trusts, corporations, and limited liability companies," and "by [debtor] refusing to cooperate in the discovery of his assets").

Next, Philips argues that the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred (Badge 8). See N.C. GEN. STAT. § 23.4(b)(8). In April 2017, over $16 million went to the Wheeler Trusts with nothing in exchange to Transtate I.[102] Philips contends that this strongly supports a finding of fraudulent intent. See S.E. Prop. Holdings v. Ctr., 2017 U.S. Dist. LEXIS 124708, at *55, *55 n.49 (S.D. Ala. Aug. 8, 2017) (party "did not receive a reasonably equivalent value for any of the subject transfers," which included LLC membership interests, interests in real property, and interests in stock shares; "notions of 'tax savings' and 'better asset

---

[101] Exs. 37–40, 46–55, 59–66.
[102] Ex. 36 at ¶ 45.

management' are not a fair equivalent value under the AUFTA."); Bergman v. N.D. Dep't of Human Servs. (In re Estate of Bergman), 688 N.W. 2d 187, 191–92 (N.D. 2004) (transfers of money to children as gifts were made without receiving a reasonably equivalent value in exchange for the transfers).

Next, Philips argues that the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred (Badge 9). See N.C. GEN. STAT. § 23.4(b)(9). More specifically, Philips argues that Transtate I was insolvent as defined by N.C. GEN. STAT. § 39-23.2[103] immediately after the $16 million transfer, because the sum of Transtate's debts, inclusive of Philips' claim, was greater than the sum of its assets. N.C. GEN. STAT. § 23.4(b)(9); Ex. 36 at ¶ 30; see also id. at ¶¶ 31–44 (insolvency analysis)); Perez v. Bui (In re Tenorio), 2018 Bankr. LEXIS 456, at *24–25 (B.A.P. 9th Cir. Feb. 8, 2018) (contingent debt is included in evaluating insolvency for fraudulent transfer purposes, because "a claim, even if disputed, is nevertheless a 'debt' for the purposes of considering a debtor's insolvency.").[104] Immediately after the $16 million transfer, Transtate I had cash of $712,553 and stockholder's equity (net

---

[103] N.C. GEN. STAT. § 39-23.2(a) provides that "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." Notably, it is appropriate to exclude the value of Transtate I's illiquid assets when assessing insolvency because they were not readily available to satisfy debt. (Ex. 36 at ¶¶ 24, 32). See Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 505 (N.D. Ill. 1988) ("Assets may be reduced by the value of the assets that cannot be readily liquidated") (citing Briden v. Foley, 776 F.2d 379, 382 (1st Cir. 1985)). Even if some portion (or all) of Transtate I's illiquid, contingent assets were counted, however, Transtate I still was insolvent after its transfers to the Wheeler Trusts. (Ex. 36 at ¶ 32).

[104] Philips also alleges that the Wheelers' transfer of their Transtate I shares to the Wheeler Trusts was fraudulent. Just as Transtate I was rendered insolvent by the $16 million transfer, the Wheelers themselves also could not have remained solvent after transferring their primary asset – the Transtate I shares – to the Wheeler Trusts. After that transfer, they would not have had the financial wherewithal to pay a judgment to Philips in the tens of millions up to over $100 million dollars.

-27-

assets) of $221,065, excluding illiquid assets.[105] Philips contends this is nowhere near enough to satisfy Philips' claim.[106]

Next, Philips argues that the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due (Badge 12). See N.C. GEN. STAT. § 23.4(b)(12). Philips asserts that Transtate I did not receive any consideration from the Wheeler Trusts that was reasonably equivalent to the $16 million value of its transfers.[107] Likewise, the Wheelers had received multiple cease and desist letters from Philips threatening litigation based on Transtate I's violations of intellectual property, and they knew, or reasonably should have believed, that after transferring $16 million, Transtate I would incur debts well beyond any ability to pay. See Official Comments 5, 6 & NC Comment to N.C. GEN. STAT. § 39-23.4 (this badge and related § 39-23.4(a)(2) relates to "insolvency in the equitable sense" and considers whether debtors' retained assets were "inadequate, i.e., unreasonably small" to pay debts as they become due.) Indeed, these transfers left insufficient reserves within Transtate I to sustain operations and satisfy debts and liabilities, including Philips' claim, going forward. (Id. at ¶¶ 30, 32–33.)

---

[105] Ex. 36 at ¶ 33.
[106] Although the insolvency analysis focuses on the fraudulent transferor's financial status before and immediately after the fraudulent transfer, an analysis of Transtate I's monthly checking account statements from March 2017 through September 2021 also reveals that while Transtate I left some cash in its bank account following the asset sale, by the end of 2017, the bank account had dropped from a high of over $17 million to just over $1 million. (Ex. 36 at ¶ 44; id. at Ex. B; see also id. at Exs. C-F (showing that limited activity through September 2021 mainly related to the Wheeler Trusts, the asset sale, and the payment of legal and other professional fees). As of September 30, 2021, only approximately $2.6 million remains in the account. (Id. at ¶ 44; id. at Ex. F).
[107] Ex. 36 at ¶ 45.

Next, Philips argues that the assets were not transferred in the course of legitimate estate or tax planning (Badge 13). See N.C. GEN. STAT. § 23.4(b)(13). According to Philips, the $16 million transfer in April 2017 was after Defendants refused to comply with Philips' cease and desist demands and after Defendants evidenced their understanding that Philips' lawsuit was imminent by contracting to indemnify Transtate II for those claims.[108] Philips contends that the rapid dissipation of the vast majority of the $16 million in transferred funds shows that trusts were not meant for legitimate tax or estate planning, but instead as a vehicle to hinder Philips' recovery on its claim by funneling assets away from Transtate I to the Wheelers. Cf. Dahar v. Jackson (In re Jackson), 318 B.R. 5, 22 ("utilization of the proceeds from the sale of the Subject Parcels to pay the Debtor's obligations and the family's living expenses substantially eroded whatever federal estate tax benefits may have been derived from the original transfers.").

Phillips further contends that the Wheeler Trusts, established after Philips' first cease and desist letter, were not legitimate or comprehensive estate plans for either Andy or Dan Wheeler. In fact, Andy Wheeler had no trusts before 2016 and did not set up his revocable trust until three years later, in 2019.[109] The Wheeler Trusts also were not part of any comprehensive estate plan for Dan Wheeler, who did not set up any revocable trust until a year and a half after the $16 million transfer.[110] As to the two "Alaska" trusts (the RAW Family Trust and the Wheeler Family Trust), Philips asserts that the Wheelers do not reside or own property in Alaska and failed to comply with Peak Trust's requests to deposit sufficient assets in Alaska, further

---

[108] Ex. 5 at 235:21–240:22, 252:21–253:7, 258:17–259:23.
[109] Ex. 1 at 27:2–29:7.
[110] Ex. 42.

-29-

underscoring the illegitimacy of such efforts to shield assets from Philips.[111]

Philips contends that the evidence therefore establishes that these transfers—made in the face of Philips' threatened litigation and to trusts created after receiving notice of Philips' claim—are not for legitimate estate or tax planning purposes. See S.E. Prop. Holdings, LLC, 2017 U.S. Dist. LEXIS 124708, at *58 n.52 (defendants "engaged in a systematic, aggressive campaign of shifting assets out of their hands and into family-owned LLCs as to which their daughters owned the overwhelming majority of the membership interests not as an estate-planning tool, but as a means of placing their assets beyond the reach of Vision Bank."); First Constitution Bank v. Masotta, 1992 Conn. Super. LEXIS 2850, at *8 (Super. Ct. Sept. 28, 1992) (rejecting defendants' claim that the transfer of the home was part of their estate planning and was not fraudulent).

Philips further asserts that it is also likely to succeed on its claim under 39-23.4(a)(2) of the NCUVTA because evidence establishes that the $16 million transfer was made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and Transtate I "[i]ntended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due" by virtue of the claims asserted by Philips, thus meeting the requirements of Section 29-23.4(a)(2)(b).[112] Finally, Philips asserts that it will likely succeed on its NCUVTA Section 39-23.5 claim because Transtate I transferred substantially all liquid assets "without receiving a reasonably equivalent value in exchange for the transfer or obligation" and "became

---

[111] Ex. 1 at 118:23–120:5; Ex. 23 at 76:20–79:6, 80:10-15 82:12–15, 85:22-24, 87:2–88:20; Ex. 11; Ex. 21.
[112] See, e.g., Ex. 36 at ¶¶ 30, 45.

insolvent as a result of the transfer[.]" N.C. Gen. Stat. § 39-23.5(a).[113]

In opposing the motion for preliminary injunction, Defendants first argue that Philips has failed to demonstrate a likelihood of success on the merits. Philips' Complaint alleges that three specific "phases" of an alleged "scheme" are voidable: (1) the recapitalization and transfer of TEC stock to the named trusts; (2) the sale of TEC assets to Transtate; and (3) the transfer of sale proceeds from TEC to the named trusts.[114] Defendants contend that Philips' present motion, however, appears to be based on only the third transfer, i.e., the transfer of asset sale proceeds from TEC to the named Trusts.[115] Philips asks the Court to "freeze the remainder of $16,335,000 in the possession, custody or control of the Wheeler Trusts and the Defendants that originated from [TEC] and was transferred to any of the Wheeler Trusts."[116] Defendants contend that Philips cannot show a likelihood of success on its claims that all three series of transfers it seeks to void were fraudulent under the NCUVTA, and its unmatured claims in the Lead Case supporting its unliquidated damages against TEC.

Defendants further contend that many of the "badges of fraud" that Philips discusses are not actually present. Defendants dispute many facts asserted by Philips in support of its argument that the badges of fraud are satisfied. Defendants argue, for example, that the Wheelers' sale of the non-voting TEC stock to the Trusts were not transfers to an insider, and the Wheelers did not retain absolute control of the Trust assets.[117] The general and administrative trustee of the BDIT

---

[113] See also Ex. 36 at ¶¶ 25–45.
[114] Doc. No. 1, Complaint.
[115] Doc. No. 181, Motion.
[116] Doc. No. 182, Philips' Proposed Order. As discussed below, it is not clear what funds Philips is requesting be frozen by its Proposed Order.
[117] Ex. D, Wood Dec., at ¶ 88.

-31-

trusts was Peak, a well-respected and independent trust company.[118] The Wheeler Family Trust

and The RAW Family Trust both specifically prohibited any sales of assets between Dan

Wheeler and a trustee who was an insider.[119] Further, although the Wheelers were the Investment

Trustees of the Wheeler Family Trust and The RAW Family Trust, they were prohibited from

taking any actions that would cause the assets of the Trusts to be included in their estates for

estate tax purposes.[120]

      Defendants further contend that the transfers were not concealed. Defendants contend

that while they did not disclose to Philips the sale of TEC's assets or the creation of the Trusts

when they occurred, there is no evidence that they took affirmative steps to conceal anything.

See TD Bank, N.A. v. Pearl, 891 F. Supp. 2d 103, 109 (D.D.C. 2012) ("TD Bank elides over the

critical difference between concealment and the absence of public disclosure; few people are

likely to disclose their estate management plans or have any reason to do so."). Defendants

further contend that Dan Wheeler fully disclosed all transactions involving his assets on his 2016

Federal Gift Tax Return, and the Wheelers reported all income of The Wheeler Family Trust and

The RAW Family Trust on their respective individual income tax returns for all relevant years.[121]

According to Defendants, there is reasonable expectation that TEC or the Wheelers would

disclose these transactions to Philips in March to April 2017. See id.

      As for Philips' contention that the transfer occurred only after Philips threatened a

lawsuit, Defendants dispute Philips' asserted facts. Defendants contend that although the

---

[118] Ex. D, Wood Dec., at ¶ 88; see also Ex. E, King Dec., at ¶¶ 17–19.
[119] Ex. D, Wood Dec., at ¶ 88.
[120] Id.
[121] Ex. D, Wood Dec., at ¶ 89. Further, documents concerning the sale of TEC's assets and the
Trusts were also produced in the Lead Case as early as February 2019.

transfers by TEC in question were finalized after NAI forwarded the August 2016 letter to Defendants, the wheels were already in motion on the Wheelers' estate planning (including the use of trusts) months before and preceding receipt of the NAI letter.[122] According to Defendants, the Wheelers were actively trying to sell TEC and engage in estate planning for many months before learning of any alleged concerns by Philips.[123]

For example, the Wheelers met with Ms. Wood and began their estate planning in July 2016, before Philips' letter to NAI in August 2016,[124] and far in advance of the first letter they received directly from Philips in December 2016.[125] Defendants further contend that, contrary to Philips' assertions, the transfers were not of "substantially all" of TEC's (or the Wheelers') assets, and neither was TEC (or the Wheelers) ever "insolvent." See N.C. GEN. STAT. §§ 39-23.4(b)(5), (9).[126] Defendants contend that TEC (and the Wheelers) had sufficient assets to satisfy any judgment related to Philips after the transfers to the Trusts were made in April 2017. Specifically, TEC still had assets totaling at least $712,000 immediately after the April 2017 transfers, with working capital of $1.68 million at the end of 2017.[127] Defendants contend that TEC currently has assets of at least $1.9 million.[128] According to Defendants, Philips improperly attempts to reduce these amounts by claiming that certain assets were "illiquid" and should not

---

[122] Ex. D, Wood Dec., at ¶¶ 4–13.
[123] Ex. I, Composite Exhibit of 2015 Emails discussing Dan Wheeler's estate planning goals.
[124] Ex. C, Wheeler Dec., at ¶¶ 8–11, 13–23; Ex. D, Wood Dec., at ¶¶ 4–13.
[125] Ex. C, Wheeler Dec., at ¶ 24.
[126] Ex. F, Estabrook Dec., at ¶¶ 7–10, 18–23; see also Ex. C, Wheeler Dec., at ¶¶ 56–65.
[127] Ex. F, Estabrook Dec., at ¶¶ 8-10, 20–23 and Ex. B to Estabrook Dec, Schedule B.
[128] Ex. C, Wheeler Dec., at ¶ 55; see also, Ex. C, Wheeler Dec., at ¶¶ 49–51 (describing TEC's recent operations).

be counted.[129] Defendant contend that this position is outside the normal course of valuation,[130] as there is no valid basis under the NCUVTA for distinguishing between liquid and illiquid assets for purposes of solvency.[131] Defendants note that the NCUVTA defines an "asset" broadly as any "property," which is defined as "[a]nything that may be the subject of ownership," and includes illiquid assets. See N.C. GEN. STAT. § 39-23.1(2), (10).[132]

Defendants also contend that the consideration received by the Wheelers in exchange for the sale of their nonvoting stock (i.e., sufficiently guaranteed promissory notes) was reasonably equivalent to the value of the assets transferred.[133] See id. § 39-23.4(b)(8). Further, an exchange of assets in the redemption of stock is for full, fair consideration, and therefore, the transfer of the proceeds from the sale of TEC's assets to the Trusts was for reasonably equivalent value.[134] See N.C. GEN. STAT. §§ 37A-4-401(c)(3), 37A-4-401(d)(2). Defendants also note that the Wheelers never absconded, but continued to reside in the same locations as they had previously.[135] See id. § 39-23.4(b)(6).

Defendants further contend that, most significantly, the assets were transferred in the course of legitimate estate and tax planning. See N.C. GEN. STAT. § 39-23.4(b)(13).[136] Defendants contend that attorney Wood will testify that the Trusts were created for legitimate

---

[129] Doc. No. 182, Pls.' Br. at pp. 19–20 n.9.
[130] Ex. F, Estabrook Dec., at ¶ 9.
[131] Ex. F, Estabrook Dec., at ¶ 9.
[132] Of note, Philips inexplicably takes the exact opposite view of its unliquidated damages claims, arguing that the full amount of its experts' damages estimates should be given full-weight and not discounted. Ex. F, Estabrook Dec,. at ¶¶ 10, 13–15.
[133] Ex. D, Wood Dec., at ¶¶ 23, 28, 31, 49, 53, 59, 78, 83, 90; Ex. E, King Dec., at ¶¶ 21–23, 35–36.
[134] Ex. E, King Dec., at ¶¶ 10, 38.
[135] Ex. D, Wood Dec., at ¶ 91; Ex. C, Wheeler Dec., at ¶ 60.
[136] See also Ex. E, King Dec., at ¶¶ 29–30, 32–33.

-34-

estate and tax planning that was initiated before Philips sent any letter to the Defendants.[137] According to Defendants, this alone should result in a denial of Philips' motion. See, e.g., In re Agnew, 355 B.R. 276, 286 (Bankr. D. Kan. 2006) ("Of primary importance is th[e] fact that the exchange fulfilled a legitimate estate planning purpose which Debtor had discussed with his mother long before bankruptcy was a possibility.").

Defendants contend that even where some evidence of certain badges of fraud may be technically present, they take on far less significance in the face of evidence that the transfers were part of legitimate estate planning. See In re Agnew, 355 B.R. at 286; In re Earle, 307 B.R. at 293. Defendants note that at least one court has identified the fact that the transfers or trusts at issue were created upon the recommendation of professionals, such as lawyers or accountants, as a "significant fact" and a "strong indication" that the transfers were part of legitimate estate planning. In re Earle, 307 B.R. at 293–94; see also In re Mart, 88 B.R. 436, 439 (Bankr. S.D. Fla. 1988) ("[T]he attorney who established both the trust and the Annuity has made it clear that both were proposed by him, not the debtor, and were designed solely for estate planning purposes and to minimize potential estate taxes, not to exempt assets from creditors' claims. The attorney, an estate planning specialist, is completely unrelated to the debtor. He saw no indication of any intent on the debtor's part to shield assets from creditors."). Defendants note that the Wheelers planned and executed the transfers at issue, including the creation of and distributions to the Trusts, upon the recommendations of their estate planning attorney, Ms. Wood, and funds from the sale of TEC's assets were dispersed according to these estate plans and applicable law.[138]

---

[137] Ex. D, Wood Dec., at ¶¶ 4–13; see also Ex. E, King Dec., at ¶¶ 9, 13–17.
[138] See generally Ex. D, Wood Dec.; Ex. E, King Dec. at ¶¶ 9–27, 31, 34–38; Ex. C, Wheeler Dec., at ¶¶ 14–20, 35–37, 48 (describing the Wheeler's estate planning activities); Ex J, Oct. 26,

While the Court makes no determination at this time on Philips' NCUVTA claim, Philips' arguments seem more plausible that Defendants. While Defendants insist that all of the money transfers were merely for estate planning purposes, the fact remains that the transfers involved exorbitant sums of money. Moreover, the timing of it all makes the transfers highly suspect. Therefore, the first <u>Winter</u> factor—whether Philips is likely to succeed on its claims—appears to slightly favor Philips. Nevertheless, because the other three <u>Winter</u> factors favor Defendants, the Court will ultimately deny the preliminary injunction motion.

**B. Irreparable Harm**

Next, the Court considers whether is likely to suffer irreparable harm from Defendants' actions. As a threshold matter, Philips must make a "'clear showing of irreparable harm . . . and the required irreparable harm must be neither remote nor speculative, but actual and imminent.'" <u>Scotts Co. v. United Indus. Corp.</u>, 315 F.3d 264, 283 (4th Cir. 2002) (citing <u>Direx Israel, Ltd. v. Breakthrough Med. Corp.</u>, 952 F.2d 802, 812 (4th Cir. 1991)). Moreover, Philips must show an "inadequacy of legal remedies.'" <u>Id.</u> (citing <u>Samson v. Murray</u>, 415 U.S. 61, 88 (1974)).

In support of the motion for preliminary injunction, Philips argues that due to the very real risk the remaining balance of the $16.3 million transfer and thus the <u>res</u> of Plaintiffs' constructive trust will be completely dissipated by the time of trial, Philips will be irreparably harmed in the absence of a freeze order. Philips contends that the Wheelers have already spent millions in trust assets, leaving only about $4.6 million as of September 30, 2021 – a fraction of the original $16 million transfer. Philips further asserts that because the Wheeler Family Trust

---

2021 Dep. of A. Wheeler ("Oct. 2021 Wheeler Dep.") at 28:07–23, 29:19–23, 66:08–18, 74:06–17, 74:23–75:13, 109:15–20, 110:25–111:20, 117:20–118:01, 158:012–158:14, 171:11–19, 179:02–11.

and RAW Family Trust have exhibited a history of making "promissory note" payments in varying large amounts at varying intervals to the Wheelers–without any evidence that such funds are being preserved by the transferees/debtors in view of Philips' claim–such disbursements are likely to continue and further whittle away the trust assets before trial. Philips contends that it has established it will suffer irreparable harm absent a freeze order because Defendants' vast dissipation of the Wheeler Trusts' assets demonstrates a serious risk that the remaining assets will be transferred before trial and become unrecoverable. Philips contends that Andy Wheeler has thwarted discovery that would allow for tracing of the dissipated assets. See Kremen, 2011 U.S. Dist. LEXIS 141273 at *6.

In response, Defendants argue that Philips' only argument regarding "irreparable harm" amounts to the assertion that Defendants lack sufficient funds to satisfy Philips' inflated, speculative damages calculation in the Lead Case. Defendants contend that Philips has not shown irreparable harm for several reasons.

First, Defendants contend that Philips inexcusably waited years to file the pending preliminary injunction motion, and that Philips further dragged its feet in terms of initiating discovery and moving the cases along. See Maaco Franchising, LLC, 2015 U.S. Dist. LEXIS 98336 at *7. Next, Defendants contend that Philips also has not shown that TEC (or any other Defendant) was insolvent at the time of the transfers of the APA sale proceeds to the Trusts or that it became unable to pay its debts when due, including any contingent, unliquidated, and future judgment Philips might obtain (however unlikely that was at the time) or that it intends to dissipate its current assets in the future. See TD Bank, N.A. v. Pearl, 891 F. Supp. 2d 103, 111 (D.D.C. 2012) (denying asset freeze where movant presented only "unsubstantiated innuendo"

and "no competent evidence to contradict" that the assets "will be more than sufficient to satisfy the claims of" creditors). Defendants likewise contend that Philips has not demonstrated that the Wheelers were or are insolvent or that they intend to engage in an imminent dissipation or fraudulent transfer of assets.[139] Instead, Philips simply points to a highly speculative and contested damages report from its expert in the Lead Case using a flawed analysis that covers multiple defendants and a period of many years after TEC ceased operations, and argues the Court should simply assume liability in the Lead Case and then accept this cumulative and inflated damages number as the basis of its insolvency analysis.[140]

According to Defendants, Philips' entire insolvency analysis is based on unquestioned acceptance of its inflated damages claim from the Lead Case for "tens of millions up to over $100 million dollars" of damages.[141] Defendants contend that Philips' damages calculations are fatally flawed for many reasons, including that the calculations are unreliable, speculative, unsupported by evidence, and they fail to show causation.[142]

Defendants further contend that there are more than sufficient funds still available to TEC if Philips succeeds on any of its claims in the Lead Case.[143] Defendants contend that this demonstrates that TEC had no intent to dissipate its assets to avoid collection by Philips. Thus, Defendants contend that nothing supports Philips' overbroad request for an asset freeze in this case, even if Philips were to prevail in the Lead Case. See Allstate Ins. Co. v. Baglioni, 2011

---

[139] Ex. F, Estabrook Dec., at ¶¶ 8–10, 16–23; Ex. C, Wheeler Dec., at ¶ 52; Ex. E, King Dec., ¶¶ 11, 24, 39–42.
[140] Ex. F, Estabrook Dec., at ¶¶ 11–14.
[141] Doc. No. 183, Pls.' Br., at p. 20 n.10.
[142] See generally, Lead Case Doc. No. 465, Memorandum of Law in Support of Defendants' Motion to Exclude the Testimony of Dr. Kennedy Under Daubert ("Kennedy Daubert Motion").
[143] Ex. C, Wheeler Dec., at ¶ 5.

-38-

U.S. Dist. LEXIS 129112, *4 (C.D. Cal. Nov. 8, 2011) ("Courts have construed this standard narrowly, only exercising their inherent authority to freeze assets where there is considerable evidence of likely asset dissipation.") (citations omitted). Defendants contend that Philips complains of no purportedly fraudulent transfer more recent than 2017, and thus has not demonstrated that Defendants intend an imminent transfer to hinder its ability to collect a future judgment. See Kaplan, 2017 U.S. Dist. LEXIS 127803 at **8–9.

The Court finds that this second factor weighs against granting the preliminary injunction motion. First, the parties vigorously dispute the actual damages to which Philips may be entitled. The Court has considered the parties' pleadings carefully, and it appears to the Court that Philips' claimed damages amount is likely highly inflated. Furthermore, it is significant that Philips waited so long to file the pending motion. The delay in filing belies Philips' contentions that it is subject to imminent, irreparable harm.

In sum, this second factor weighs against granting the preliminary injunction motion.

## C.  Whether the Balance of Equities Weighs in Plaintiff's Favor

Next, as to whether the balance of equities weighs in Plaintiff's favor, Philips that it seeks only a freeze of a particular set of assets in which it has an equitable interest–the $16 million in transferred funds currently sitting in the Wheeler Trusts accounts or other accounts under Defendants' control, not Defendants' assets in general. Philips states it merely seeks to prevent further interference with these assets and thus preserve Philips' ability to recover at least the assets that remain. According to Philips, Defendants cannot articulate any harm from freezing these assets that outweighs harm to Philips, particularly given the high rate of spend from the Wheeler Trusts (roughly $13 million within a few years) and Andy Wheeler's high salary at

Transtate II that is presumably sufficient to fund his personal living expenses for a several month period leading up to trial. (Ex. 1 at 184:8–21). Philips argues that, on the other hand, it stands to lose a great deal absent a preliminary injunction freezing those assets, particularly because it faces the very real risk that it will be left with no remedy.

In response, Defendants contend that the balance of equities favors Defendants here due to Philips' long delay and related failure to show any irreparable harm. See HMS Holdings LLC, 2021 U.S. Dist. LEXIS 214131, at *11 ("delay also affects the balance of hardships"). Defendants contend, furthermore, that if the Court grants the requested injunction, Defendants may be limited or unable to use assets to defend against Philips' claims in this case and the Lead Case, which would be an untenable hardship to Defendants. According to Defendants, this is especially true here where the timing of Philips' motion suggests an attempt to gain strategic advantage and leverage in the Lead Case via its superior resources.[144] Further, freezing the Trust assets would prevent the various trustees from discharging their legal duties to protect the trust's assets by, e.g., paying taxes,[145] making distributions to preserve the Trusts' status as qualified Subchapter S trusts, and making required payments on bona fide indebtedness, such as mortgage payments.

The Court finds that the balance of equities weighs against granting the preliminary injunction. This Court disfavors entering an order that could negatively impact Defendants' ability to defend this case as well as the Lead Case in this matter. The Court is also concerned

---

[144] See, e.g., Lead Case Doc. No. 607, February 21, 2022 Motion adding yet another partner to the Philips Legal team.
[145] Payment of taxes is expressly excepted from the NCUVTA. See N.C. GEN. STAT. § 39-23.8(e)(3).

that freezing assets could interfere with trustee's financial obligations. Finally, the Court finds the fact that Philips' delay in bringing the motion also influences the Court decision as to this factor.

In sum, the third factor weighs against granting the preliminary injunction motion.

**D. Whether an Injunction is in the Public Interest**

Philips contends that imposing a preliminary injunction would promote, not harm, the public interest because "[t]here is, of course, no public policy interest in aiding a fraud on creditors[.]" In re Aldrich Pump LLC, 2021 Bankr. LEXIS 2294, at *101 (Bankr. W.D.N.C. Aug. 23, 2021). In response, Defendants contend that Philips has not met its burden, and the public interest is not furthered by granting a preliminary injunction here. Defendants contend that the inherent right of persons not subject to a judgment to control their property outweighs any benefit to a plaintiff being able to "freeze" assets so that they are available for possible future judgments of an unknown amount. Defendants argue that if Philips' arguments are accepted, a plaintiff would be entitled to an automatic asset freeze any time it simply claims some amount over and above the defendant's assets. According to Defendants, this would create a perverse incentive for plaintiffs to grossly inflate damages claims to create leverage and strategic advantage.

Here, the Court finds that the final factor weighs against granting the preliminary injunction motion. While the Court makes no finding on damages at this point, the evidence so far does not appear to support the amount of Plaintiff's claimed damages. Moreover, the Court finds persuasive Defendants' arguments at the hearing that a freeze on their assets would impede their responsibilities to pay monies owed out of the assets, such as mortgage payments.

The Court concludes that, applying the <u>Winter</u> factors, the motion for preliminary injunction will be denied.

## IV.    CONCLUSION

Here, the Court finds that application of the <u>Winter</u> factors results in a tipping of the balance in favor of Defendants. Accordingly, Plaintiff's Motion for a Preliminary Injunction is denied.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. No. 181) is **DENIED**.

Signed: October 17, 2022

Max O. Cogburn Jr.
United States District Judge

-42-